12-4301 (L)
T.M. v. Cornwall Central School District

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

————————

August Term, 2013

(Argued: October 22, 2013                    Decided: April 2, 2014)

Docket Nos. 12-4301 (Lead) & 12-4484 (XAP)

————————

T.M., by A.M. and R.M., his parents,

*Plaintiff–Appellant–Cross-Appellee,*

—v.—

CORNWALL CENTRAL SCHOOL DISTRICT,

*Defendant–Appellee–Cross-Appellant.*[*]

————————

Before :

KATZMANN, *Chief Judge*, KEARSE and WESLEY, *Circuit Judges.*

————————

———————————

[*]The Clerk of the Court is respectfully directed to amend the official caption to conform with that above.

1

Appeal from a September 26, 2012 decision and resulting judgment of the United States District Court for the Southern District of New York (Briccetti, *J.*) granting summary judgment for defendant Cornwall Central School District ("Cornwall"). Cross-appeal from the district court's August 7, 2012 decision granting the motion by plaintiff T.M., through his parents, for a preliminary injunction, and its October 9, 2012 decision denying defendant's motion to amend that decision. We hold that the least restrictive environment ("LRE") requirement of the Individuals with Disabilities Education Act, 20 U.S.C. § 1412(a)(5)(A), applies to extended school year ("ESY") placements as it does to regular school-year placements. We therefore conclude that the district court erred in determining that Cornwall met the LRE requirement when it offered T.M. only an ESY placement in a self-contained special education class. We also hold that the district court erred by requiring Cornwall to reimburse T.M.'s parents for the entire cost of the pendency services they obtained for T.M. from private providers after Cornwall offered to provide equivalent services directly. Accordingly, the district court's judgment is **VACATED** and the case is **REMANDED** for further proceedings.

—————————

GARY S. MAYERSON (Tracey Spencer Walsh & Maria C. McGinley,
    *on the brief*), Mayerson & Associates, New York, NY, *for*
    *Plaintiff–Appellant–Cross-Appellee.*

CHRISTOPHER P. LANGLOIS (Karen S. Norlander, *on the brief*),
    Girvin & Ferlazzo, P.C., Albany, NY, *for*
    *Defendant–Appellee–Cross-Appellant.*

—————————

KATZMANN, *Chief Judge*:

This case calls upon us to determine how the least restrictive environment ("LRE") provision of the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1482,[1] applies to extended school year ("ESY") placements for children who need twelve-month educational programs.

Plaintiff–Appellant–Cross-Appellee T.M. is a child with autism. His parents claim on his behalf that Defendant–Appellee–Cross-Appellant Cornwall Central School District ("Cornwall") violated the IDEA by denying T.M. a free appropriate public education ("FAPE") in his LRE. They also claim that Cornwall must reimburse them for the cost of certain educational services, called pendency

—————————

[1] The IDEA was subsequently reauthorized and amended by the Individuals with Disabilities Education Improvement Act of 2004 ("IDEIA"), Pub. L. No. 108–446, 118 Stat. 2647.

3

services, that they obtained for him from private providers. These services are intended to ensure that T.M. will remain in the same educational placement while the current proceedings are pending. *See* 20 U.S.C. § 1415(j).

The United States District Court for the Southern District of New York (Briccetti, *J.*) granted summary judgment for Cornwall, finding that Cornwall had offered T.M. a FAPE in the appropriate LRE. However, the district court also ordered Cornwall to reimburse T.M.'s parents for the full cost of the privately-obtained pendency services. T.M.'s parents appeal the grant of summary judgment, arguing primarily that Cornwall violated the IDEA's LRE requirement because it did not offer to place T.M. in a mainstream classroom for his extended school year program. Cornwall cross-appeals on the pendency services issue.

We hold that the IDEA's LRE requirement applies to ESY placements just as it does to school-year placements. Once Cornwall's Committee on Special Education determined that T.M. needed a twelve-month educational program, including an ESY placement, in order to prevent substantial regression, it was required to consider a continuum of alternative ESY placements and to offer T.M. the least restrictive placement from that continuum appropriate for his needs. The district court therefore erred in determining that Cornwall met its obligations

4

under the IDEA by offering T.M. only an ESY placement in a self-contained

special education classroom.

We further hold that the district court erred by ordering Cornwall to pay

the full cost of obtaining T.M.'s pendency services through private providers

even though Cornwall had offered to provide the same services itself at a lower

cost. Although Cornwall was wrong to deny T.M. pendency services in the first

place, it nevertheless is not required to pay for T.M. to remain with the same

pendency services providers throughout this entire litigation.

We therefore vacate the district court's judgment and remand for further

proceedings.

**BACKGROUND**

A.    Legal Framework

The IDEA requires states receiving federal special education funding to

provide disabled children with a FAPE.  *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*,

725 F.3d 131, 135 (2d Cir. 2013); *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 174–75

(2d Cir. 2012). "To ensure that qualifying children receive a FAPE, a school

district must create an individualized education program ('IEP') for each such

child." *R.E.*, 694 F.3d at 175; *see also* 20 U.S.C. § 1414(d). That IEP must be

5

developed in accordance with the procedures laid out in the IDEA, and must be "reasonably calculated to enable the child to receive educational benefits." *Bd. of Educ. v. Rowley*, 458 U.S. 176, 207 (1982). The state must also ensure that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). In other words, the state must seek to educate each child with a disability in his or her LRE. *See M.W.*, 725 F.3d at 143.

Some children with disabilities need educational services not only during the regular school year, but over the summer as well. An IEP may therefore provide for a full twelve-month educational program that includes regular school-year services as well as ESY services over the summer. The IDEA's implementing regulations require school districts to "ensure that extended school year services are available as necessary to provide FAPE." 34 C.F.R. § 300.106(a)(1). In New York, disabled students "shall be considered for 12-month special services and/or programs" if "because of their disabilities, [they] exhibit the need for a 12-month special service and/or program . . . in order to prevent substantial regression." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(k)(1)(v).

New York parents who believe that a school district has failed to provide their child a FAPE in his or her LRE may present a due process complaint notice and request an impartial hearing before an impartial hearing officer ("IHO"). 20 U.S.C. § 1415(b)(6), (b)(7)(A), (f); N.Y. Educ. Law § 4404(1). Any party aggrieved by the IHO's decision may then appeal to the state educational agency for an impartial review by a state review officer ("SRO"). 20 U.S.C. § 1415(g); N.Y. Educ. Law § 4404(2). Next, any party aggrieved by the SRO's decision may file a civil action in federal district court to obtain further review. 20 U.S.C. § 1415(i)(2)(A). The district court receives the records of the state administrative proceedings and hears additional evidence if requested. *Id.* § 1415(i)(2)(C)(i)–(ii). "[B]asing its decision on the preponderance of the evidence," the district court "shall grant such relief as [it] determines is appropriate." *Id.* § 1415(i)(2)(C)(iii).

Concerned parents are not required to leave their child in the public school system while this process is pending. Instead, parents who think that the state has failed to offer their child a FAPE in the appropriate LRE may pay for private services, including private schooling, and then seek reimbursement from the school district. *M.W.*, 725 F.3d at 135; *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 246 (2d Cir. 2012); *see also Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471

U.S. 359, 369–71 (1985). According to the three-part *Burlington/Carter* test, the parents will be entitled to reimbursement if (1) the school district's proposed placement violated the IDEA, (2) the parents' alternative private placement was appropriate, and (3) equitable considerations favor reimbursement. *M.W.*, 725 F.3d at 135; *see Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16 (1993).

Finally, the IDEA's pendency provision entitles a disabled child to "remain in [his] then-current educational placement" while the administrative and judicial proceedings described above are pending. 20 U.S.C. § 1415(j). That provision seeks to maintain the educational status quo while the parties' dispute is being resolved. *See Mackey ex rel. Thomas M. v. Bd. of Educ.*, 386 F.3d 158, 160–61 (2d Cir. 2004). It therefore "require[s] that a school district continue to finance an educational placement made by the agency and consented to by the parent before the parent requested a due process hearing." *Id.* at 163 (quoting *Zvi D. v. Ambach*, 694 F.2d 904, 906 (2d Cir. 1982)).

B.    Factual Background

T.M. was born in July 2004. He has been diagnosed with autism, a developmental disorder whose symptoms include difficulty with social interaction, difficulty with communication, and repetitive behavior. *See Autism*

8

*Spectrum Disorders (ASDs)*, CDC, http://www.cdc.gov/ncbddd/autism /hcp-dsm.html (last visited Nov. 1, 2013); *see also* Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 51 (5th ed. 2013) (adopting the broader term "autism spectrum disorder"). T.M.'s autism makes him occasionally show "interfering behaviors," such as playing with his fingers, rolling his socks, twitching his legs, twirling his hair, and talking or singing inappropriately.

At the age of three years old, T.M. was classified as a preschool child with a disability. He attended three different private preschool programs, including the Butterhill Day School ("Butterhill"). In all three preschool programs, T.M. was educated in "mainstream" general education classrooms with non-disabled students. T.M. also received additional preschool special education services, which the school district furnished through private providers.

T.M. turned five years old in July 2009, making him eligible to begin attending public school in 2009–2010. *See* N.Y. Educ. Law § 3202(1). In May 2009, Cornwall's Committee on Special Education ("CSE") determined that T.M. needed a twelve-month educational program, including ESY services, in order to prevent substantial regression in his development. *See* N.Y. Comp. Codes R. &

9

Regs. tit. 8, § 200.6(k)(1)(v). The CSE therefore produced an IEP outlining the educational services Cornwall would provide for T.M. over the summer of 2009. Under that May 2009 IEP, which T.M.'s parents accepted, T.M. received 25 hours per week of one-on-one ("1:1") instruction from a special education itinerant teacher ("SEIT"); two 45-minute sessions per week of 1:1 occupational therapy; two 45-minute sessions per week of 1:1 physical therapy; three 30-minute sessions per week of 1:1 speech and language therapy; and three hours per month of parent counseling and training.[1]

In August 2009, Cornwall's CSE met again to develop an IEP for T.M.'s 2009–2010 academic year (from September 2009 through June 2010). The CSE recommended that T.M. be placed in a mainstream kindergarten classroom with additional supports, including a 1:1 teaching assistant to support T.M. in the classroom and one hour per day of additional instruction at home. The CSE also recommended that T.M. should receive a variety of special education services similar to those recommended in the May 2009 IEP.

T.M.'s parents objected to the CSE's August 2009 IEP. They asserted that T.M. would need a 1:1 special education teacher (rather than a teaching assistant)

_____

[1] These were the same special education services that T.M. had received from September 2008 through June 2009, in his last year of preschool.

to support him in the classroom, and would also need two to three hours per day of instruction at home. T.M.'s parents therefore requested an impartial hearing. *See* 20 U.S.C. § 1415(f); N.Y. Educ. Law § 4404(1). They subsequently enrolled T.M. in Butterhill's developmental kindergarten program for the 2009–2010 academic year, which was a mainstream classroom designed to transition normally developing children into a full kindergarten program. They also arranged at their own expense to continue the same special education services, with the same providers, that T.M. had received under the May 2009 IEP.

In October 2009, Cornwall and T.M. reached a stipulation of settlement resolving T.M.'s request for an impartial hearing. Under that stipulation of settlement, T.M.'s parents agreed to pay the cost of T.M.'s 2009–2010 tuition at Butterhill, while Cornwall agreed to pay for the additional special education services described in the May 2009 IEP for the 2009–2010 academic year. The stipulation of settlement also provided that it "d[id] not constitute an agreement . . . under the pendency provision of the IDEIA for any continued payment, placement, or program in a future year or evidence of support for the Parents' requested program." Joint Appendix ("J.A.") 547.

11

Cornwall's CSE met again on March 19 and April 16, 2010, to prepare a new IEP for T.M.'s 2010–2011 year. At those meetings, the CSE heard from T.M.'s service providers and reviewed reports from Cornwall staff who had observed T.M. at Butterhill. However, the CSE did not conduct a separate functional behavioral assessment ("FBA") focused on T.M.'s interfering behaviors, nor did it develop a specific behavioral intervention plan ("BIP") to deal with those behaviors.[2]

After its April 2010 meeting, the CSE proposed a new IEP for T.M.'s next twelve-month school year (from July 2010 through June 2011). The CSE again determined that T.M. required a twelve-month program, including ESY services, in order to prevent substantial regression over the summer months. For T.M.'s

---

[2] New York law defines an FBA as "the process of determining why the student engages in behaviors that impede learning and how the student's behavior relates to the environment." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(r). An FBA:

> shall include, but is not limited to, the identification of the problem behavior, the definition of the behavior in concrete terms, the identification of the contextual factors that contribute to the behavior (including cognitive and affective factors) and the formulation of a hypothesis regarding the general conditions under which a behavior usually occurs and probable consequences that serve to maintain it.

*Id.*; *see also id.* § 200.22(a)(2) (describing the information on which an FBA must be based). A BIP is "a plan that is based on the results of a [FBA] and, at a minimum, includes a description of the problem behavior, global and specific hypotheses as to why the problem behavior occurs and intervention strategies that include positive behavioral supports and services to address the behavior." *Id.* § 200.1(mmm).

ESY program in July and August 2010, the CSE considered two ESY placement options. The first option, and the one Cornwall eventually recommended, was Cornwall's own summer special education program. That program operated on a six-week, half-day schedule, offering three hours of instruction per day in a 12:1+1 classroom (that is, a classroom with twelve students, one teacher, and one teaching assistant). As Cornwall's summer special education program is open only to students with disabilities, all of T.M.'s fellow students in that classroom would have been disabled. The second option that the CSE considered was a full-day BOCES[3] program, which T.M.'s parents rejected. Like Cornwall's ESY program, the BOCES program would have placed T.M. in a classroom with only disabled students. Cornwall does not operate any mainstream summer program, and did not offer to place T.M. in any public or private mainstream summer program.

The April 2010 IEP also proposed that T.M. should continue to receive additional special education services as part of his ESY program, including two 30-minute sessions per week of 1:1 occupational therapy, two 30-minute sessions

---

[3] New York law authorizes the creation of boards of cooperative educational services ("BOCES"), which operate to provide shared educational programs and services across school districts. *See* N.Y. Educ. Law § 1950(1).

per week of 1:1 physical therapy, two 30-minute sessions per week of 1:1 speech and language therapy, and one 30-minute session per week of 5:1 speech and language therapy. The April 2010 IEP did not provide for a 1:1 teaching assistant for T.M. or behavior consultant services, although those items were mentioned at the CSE meeting. It also did not provide for any parent counseling and training sessions over the summer.

For T.M.'s school-year program, the April 2010 IEP would have placed T.M. in Cornwall's regular kindergarten classroom, with approximately 25 students, one teacher, and one teaching assistant. For his English and math classes, however, T.M. would have been taught separately in a 12:1+1 special education classroom for a total of 90 minutes each day. T.M. would have been assigned an additional 1:1 teaching assistant to support him throughout the day. He would also have received further special education services: two 45-minute sessions per week of 1:1 occupational therapy, two 30-minute sessions per week of physical therapy, three 30-minute sessions per week of 1:1 speech and language therapy, one 30-minute session per week of 5:1 speech and language therapy, two one-hour sessions per week of behavior consultant services, and one hour per month of parent counseling and training.

T.M.'s mother and his behavior consultant met with Cornwall officials on June 10, 2010. At that meeting, Cornwall's director of pupil personnel services stated that the April 2010 IEP would be amended to include a 1:1 teaching assistant and behavior consultant services as part of the proposed ESY program.

On June 16, 2010, T.M.'s parents informed Cornwall that they considered the April 2010 IEP insufficient. They subsequently sent Cornwall a due process complaint notice requesting an impartial hearing. *See* 20 U.S.C. § 1415(b)(6), (b)(7)(A), (f); N.Y. Educ. Law § 4404(1). That complaint notice also invoked T.M.'s rights under the IDEA's pendency provision, asserting that Cornwall was required to provide T.M. with the special education services listed in the May 2009 IEP (as T.M.'s then-current educational placement) until the impartial hearing and any subsequent proceedings were completed. *See* 20 U.S.C. § 1415(j). Having rejected Cornwall's proposed ESY program, T.M.'s parents enrolled him in Butterhill's half-day mainstream summer program for six weeks in July and August 2010.

Cornwall responded by informing T.M.'s parents that, in its opinion, the April 2010 IEP was procedurally and substantively appropriate. It also contended

15

that under the October 2009 stipulation of settlement, T.M. was not entitled to have Cornwall provide any pendency services.

The parties met for a resolution session on July 30, 2010, but were unable to reach agreement. On August 20, 2010, Cornwall scheduled another CSE meeting to make changes to T.M.'s IEP. The CSE then issued a revised IEP that altered the proposed academic-year program in several ways; for instance, the new IEP added an additional 30-minute session per week of 1:1 speech and language therapy, lengthened the weekly 30-minute session of 5:1 speech and language therapy to a full hour, and provided more support for T.M.'s educational staff. However, T.M.'s parents found that the August 2010 IEP was still insufficient. They sent Cornwall an amended due process complaint notice rejecting it and again requesting an impartial hearing. They then enrolled T.M. in Butterhill's regular mainstream kindergarten program for the 2010–2011 academic year, and paid out of pocket for his Butterhill tuition and for additional special education services. Those special education services were similar to the services described in the May 2009 IEP, but went somewhat further; for instance, they included 35 hours of 1:1 SEIT services per week, rather than only 25 hours.

B.      Proceedings Before the IHO

Because the parties had failed to resolve their differences, a state IHO held

an administrative hearing on eight nonconsecutive days between September 13,

2010 and January 31, 2011. On February 2, 2011, the IHO issued a decision

finding that T.M. was entitled to ongoing pendency services at the level

described in the May 2009 IEP. She therefore ordered Cornwall to reimburse

T.M.'s parents for such services on a twelve-month basis from July 1, 2010

onwards.[4]

On May 16, 2011, the IHO issued a second decision finding that Cornwall

had failed to offer T.M. a FAPE in his LRE for the 2010–2011 year. She

determined that the ESY placement Cornwall offered T.M. for the summer

months was overly restrictive because it placed him in a special education

classroom rather than a general education classroom. While the IHO

acknowledged Cornwall's argument that it did not operate any mainstream

summer program, she held that "the absence of an appropriate in-district setting

---

[4] The May 2009 IEP provided for three hours per month of parent counseling and training. Although the IHO's order determined that T.M. was entitled to the services described in his May 2009 IEP as pendency services, it ordered Cornwall to pay for only one hour per month of parent counseling and training. We assume, as the parties apparently did, that this discrepancy is merely a scrivener's error in the IHO's order.

17

does not negate a student's right to be educated in the LRE." J.A. 1070. She also noted the absence of any 1:1 teaching assistant or behavior consultant in the ESY program described in the April 2010 IEP.

Next, the IHO determined that the school-year program Cornwall had proposed was also insufficient. She found that given T.M.'s interfering behaviors, Cornwall was required to perform an FBA and develop a BIP when preparing T.M.'s IEP. She also found that the 25-student general education kindergarten class that Cornwall offered was too large for T.M., and that the special education English and math classes were overly restrictive. Moreover, she determined that the proposed daily schedule did not provide sufficient continuity for T.M., and did not include enough behavior consultant support.

Applying the *Burlington/Carter* test, the IHO found that T.M.'s parents were entitled to reimbursement for T.M.'s tuition for the twelve-month 2010–2011 year, because the alternative placement T.M.'s parents had developed was appropriate and equitable factors supported reimbursement. The IHO therefore directed Cornwall to pay for T.M.'s Butterhill tuition from July 2010 through June 2011, and for the additional special education services that T.M.'s parents had obtained for that year.

C.    Subsequent Developments

In accordance with the IHO's decision on pendency services, Cornwall reimbursed T.M.'s parents for the amount that they spent during the 2010–2011 year on special education services within the scope of the May 2009 IEP. However, Cornwall appealed the IHO's pendency decision to the extent that it required Cornwall to continue paying for T.M. to obtain pendency services from his private providers, rather than allowing Cornwall to provide T.M.'s pendency services directly. Cornwall also appealed the IHO's determination that it had failed to offer T.M. a FAPE in his LRE, and that T.M.'s private alternative placement was appropriate. In accordance with the statutory scheme described above, Cornwall sought review of those decisions by an SRO.

Meanwhile, T.M.'s parents sent Cornwall a letter stating that they intended to keep T.M. at Butterhill for the next twelve-month year, from July 2011 through June 2012, and intended to continue obtaining special education services (including T.M.'s pendency services) from the same private providers. They asserted that Cornwall had again failed to offer T.M. a FAPE for the 2011–2012 year, and that Cornwall was therefore responsible for funding T.M.'s Butterhill tuition and all of his special education services (including his pendency services)

19

for that year as well. Cornwall acknowledged this letter, and confirmed that T.M.'s parents were rejecting the IEP it had offered for T.M.'s 2011–2012 summer program. On the pendency issue, Cornwall stated that instead of paying private providers for T.M.'s pendency services, it would provide T.M.'s pendency services directly for the 2011–2012 year. Specifically, it offered to provide the following pendency services:

> (a) 25 hours per week of 1:1 SEIT services, at Butterhill and in the home, to be provided by [Cornwall] special education teacher Julie Hahn, (b) three thirty minute sessions per week of 1:1 speech and language therapy, to be provided by [Cornwall] speech therapist, Lori Neilson, (c) two forty-five minute sessions per week of 1:1 occupational therapy, to be provided by [Cornwall] occupational therapist Patricia Deery, (d) two forty-five minute sessions per week of 1:1 physical therapy, provided by [Cornwall] physical therapist Sheila Reed, and (e) one hour per month of parent training and counseling in each of speech and language, occupational therapy, and physical therapy.

J.A. 1243–44. These are the same services that were described in the May 2009 IEP, and the same services that the IHO determined Cornwall was required to provide as T.M.'s pendency services. The only difference is that Cornwall was offering to provide those services through its own staff rather than through the private providers T.M. had previously used.

T.M.'s parents rejected Cornwall's offer to provide T.M.'s pendency services directly. Because Cornwall had initially refused to provide T.M.'s pendency services itself, they asserted, it was "estopped to insist on now substituting new personnel." J.A. 1246. They maintained that Cornwall was obligated to pay for T.M. to obtain pendency services from his current private providers.

D.    Proceedings before the SRO

The SRO issued her decision regarding Cornwall's appeal on August 22, 2011. First, the SRO found that the IHO had correctly granted T.M. the pendency services to which he was entitled for the 2010–2011 year. However, the SRO ordered Cornwall to reimburse T.M.'s parents only "for the costs of [T.M.'s] pendency program . . . from the date of July 1, 2010 for the twelve-month school year." J.A. 1178. T.M.'s parents and Cornwall both interpret that language to mean that according to the SRO, Cornwall was not required to reimburse T.M.'s parents for pendency services obtained from private providers after June 30, 2011.

Next, the SRO determined that Cornwall had properly offered T.M. a FAPE in his LRE for the 2010–2011 year. The SRO found that Cornwall was not

21

required to offer T.M. an ESY program in a mainstream classroom, because Cornwall "does not have an obligation to provide ESY services to nondisabled students and did not have any summer programs for non-disabled students in which the student could be placed." J.A. 1177. As for the April 2010 IEP's failure to include a teaching assistant or behavior consultant services in T.M.'s ESY program, the SRO noted that Cornwall had assured T.M.'s mother in June 2010 that these services would in fact be provided, and that Cornwall's director of pupil services had testified that their omission from the IEP was a clerical error.

The SRO also found that the school-year program Cornwall offered T.M. was appropriate. She rejected the IHO's determination that Cornwall was required to conduct an FBA and develop a BIP, finding that the evaluations and observations that Cornwall considered in developing the April 2010 and August 2010 IEPs provided sufficient information to determine T.M.'s educational needs. She found that T.M.'s interfering behaviors "were not of such a frequency or degree so as to impede his learning or that of others," and "could adequately be redressed by redirection and refocusing." J.A. 1170. Moreover, the April 2010 IEP included strategies for dealing with T.M.'s behaviors. The SRO concluded that as Cornwall had thoroughly considered T.M.'s needs and developed appropriate

22

strategies to meet those needs, it did not deny him a FAPE education by omitting an FBA and BIP.

The SRO also determined that the IHO erred in finding the proposed 25-student kindergarten class was too large for T.M. She observed that T.M. would have been supported in the classroom by a 1:1 teaching assistant, and that the kindergarten class functioned with a "small groups" structure that would reduce the impact of the class size. The SRO further stated that the IEP included sufficient support from a behavior consultant. Finally, the SRO found that the proposed special education English and math classes were not overly restrictive, because the hearing record showed that T.M. required specialized instruction in these subjects.

Because the SRO determined that Cornwall had properly offered T.M. a FAPE in his LRE, it denied his claim for tuition reimbursement without reaching the other two parts of the *Burlington/Carter* test. That is, the SRO did not rule on whether the alternative placement that T.M.'s parents developed was appropriate or whether equitable considerations supported reimbursement.

E.    Proceedings Before the District Court

On September 15, 2011, T.M.'s parents filed suit in the United States District Court for the Southern District of New York to seek review of the SRO's decision. *See* 20 U.S.C. § 1415(i)(2)(A). On the pendency services issue, they argued that the SRO erred by requiring Cornwall to pay for pendency services from private providers for only the 2010–2011 year. They also challenged the SRO's determination that Cornwall offered T.M. an appropriate twelve-month educational program for 2010–2011, arguing that both the proposed ESY placement and the proposed school-year placement were inadequate. T.M.'s parents moved for a preliminary injunction on the pendency issue and for summary judgment on the merits; Cornwall cross-moved for summary judgment.

On August 7, 2012, the district court granted the motion for a preliminary injunction, ruling that Cornwall was required to continue reimbursing T.M.'s parents for pendency services that they obtained for T.M. from private providers. It held that T.M.'s pendency rights entitled him not only to have the services described in the May 2009 IEP, but also to have those services provided by the private providers who assisted him during the 2010–2011 year. The district

24

court was of the view that the SRO had approved T.M.'s parents' choice of private providers, and so had incorporated those providers into T.M.'s pendency entitlements. It also noted that Cornwall was offering to provide T.M.'s pendency services only directly at Cornwall facilities, rather than offering to send Cornwall staff to Butterhill to provide T.M.'s pendency services. It consequently rejected what it perceived as an attempt to "unilaterally transfer T.M. from a private school to a public school." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, No. 11-CV-6459, 2012 WL 4069299, at *8 (S.D.N.Y. Aug. 7, 2012).

Cornwall filed a motion to amend the district court's decision, which was denied on October 9, 2012. In denying that motion, the district court recognized that it had erred in determining that the SRO's decision changed T.M.'s pendency placement. It also recognized it had erred in believing Cornwall had offered to provide T.M. pendency services only if he transferred to public school. The district court nevertheless reaffirmed its prior order, holding that "when, as here, a school district flatly refuses to recognize a student's pendency rights, the school district must reimburse the parents for the costs of the pendency services privately secured by the parents until the underlying dispute is resolved." J.A. 1396 (quoting J.A. 1389–91).

Meanwhile, on September 26, 2012, the district court entered a decision granting summary judgment for Cornwall. Like the SRO, the district court found that Cornwall had properly offered T.M. a FAPE in his LRE for the entire 2010–2011 year. As to the ESY program that Cornwall offered T.M. for the summer of 2010, the district court found that it did not violate the IDEA's LRE requirement. Although it recognized that Cornwall offered to place T.M. only in a special education summer program, not a mainstream program, it found that T.M.'s parents had "not shown that a less-restrictive placement option was available to TM but not offered." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 900 F. Supp. 2d 344, 353 (S.D.N.Y. 2012). It therefore concluded that Cornwall had appropriately offered T.M. a summer placement in his LRE.

The district court next affirmed the SRO's determination that Cornwall was not required to conduct an FBA or develop a BIP as part of T.M.'s IEP because T.M.'s interfering behaviors did not impede learning, and because the April 2010 and August 2010 IEPs adequately addressed those behaviors. The district court also affirmed the SRO's determination that Cornwall offered T.M. an appropriate placement for the 2010–2011 year. T.M.'s parents raised only one challenge to that determination in their brief to the district court, arguing that the 25-student

kindergarten class was too large; the district court rejected that argument,

deferring to the SRO's evaluation of the evidence in the record.

Having found that Cornwall offered T.M. a FAPE in his LRE for 2010-2011,

the district court granted summary judgment for Cornwall without addressing

the appropriateness of T.M.'s private alternative placement or any equitable

considerations regarding reimbursement.

T.M.'s parents appealed from the district court's decision awarding

Cornwall summary judgment, and Cornwall cross-appealed from the district

court's decisions on the pendency issue. We have jurisdiction under 28 U.S.C.

§ 1291.[5]

**DISCUSSION**

A.    The Appeal

On appeal, T.M.'s parents argue that the district court erred in granting

summary judgment to Cornwall after determining that the April 2010 and

August 2010 IEPs met the requirements of the IDEA.

---

[5] No separate final judgment appears on the district court docket. We nevertheless retain jurisdiction over this appeal, since the district court's orders disposed of all the claims in the case. *See Bouboulis v. Transport Workers Union of Am.*, 442 F.3d 55, 60 (2d Cir. 2006) ("The failure of the Clerk to enter a separate judgment does not require this Court to dismiss the appeal.").

1. Legal Standard

"We review *de novo* the district court's grant of summary judgment in an IDEA case." *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 171 (2d Cir. 2009). In the context presented here, summary judgment is simply a "pragmatic procedural mechanism for reviewing administrative decisions." *M.W. ex rel. S.W. v. N.Y.C. Dep't of Educ.*, 725 F.3d 131, 138 (2d Cir. 2013) (quoting *T.P. ex rel. S.P. v. Mamaroneck Union Free Sch. Dist.*, 554 F.3d 247, 252 (2d Cir. 2009) (per curiam)). In reviewing those administrative decisions, we bear in mind that "[t]he responsibility for determining whether a challenged IEP will provide a child with an appropriate public education rests in the first instance with administrative hearing and review officers." *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998); *see also M.W.*, 725 F.3d at 138. We therefore afford a significant degree of deference to the state educational agency, particularly where the agency's decisions are well-reasoned and supported by the record. *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 241 (2d Cir. 2012); *P. ex rel. Mr. and Mrs. P. v. Newington Bd. of Educ.*, 546 F.3d 111, 118 (2d Cir. 2008). Where the decisions of the IHO and the SRO disagree, we defer to the decision of the SRO as the final state

administrative determination, though we may also consider the IHO's analysis if we find the SRO's decision unpersuasive. *M.H.*, 685 F.3d at 246.

To decide whether an IEP complies with the IDEA, we follow a two-part test. *See Bd. of Educ. v. Rowley*, 458 U.S. 176, 206–07 (1982). The first part examines the procedural adequacy of the IEP, asking "whether the state has complied with the procedures set forth in the IDEA." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 190 (2d Cir. 2012) (quoting *Cerra v. Pawling Cent. Sch. Dist.*, 427 F.3d 186, 192 (2d Cir. 2005)). Procedural violations will entitle parents to reimbursement only if they "impeded the child's right to a [FAPE]," "significantly impeded the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child," or "caused a deprivation of educational benefits." 20 U.S.C. § 1415(f)(3)(E)(ii); *see also R.E.*, 694 F.3d at 190. The second part of the test examines the substantive adequacy of the IEP by asking whether it was "reasonably calculated to enable the child to receive educational benefits." *Rowley*, 458 U.S. at 207; *see also R.E.*, 694 F.3d at 190. In determining the substantive adequacy of the IEP, we must also consider whether the state complied with the IDEA's LRE requirement by educating the child, to the maximum extent appropriate, with children who are not disabled. *See* 20 U.S.C.

29

§ 1412(a)(5)(A); *M.W.*, 725 F.3d at 143–46. "Substantive inadequacy automatically entitles the parents to reimbursement," as long as the parents' alternative placement was appropriate and equitable considerations favor reimbursement. *M.W.*, 725 F.3d at 143 (quoting *R.E.*, 694 F.3d at 190); *see also Florence Cnty. Sch. Dist. Four v. Carter*, 510 U.S. 7, 15–16 (1993); *Sch. Comm. of the Town of Burlington v. Dep't of Educ.*, 471 U.S. 359, 369–71 (1985).

We normally address the two parts of this test in the order given above. *See, e.g.*, *M.W.*, 725 F.3d at 139–47. In this case, however, the parents' primary argument on appeal is substantive. We therefore consider their arguments for substantive inadequacy first before turning to the asserted procedural violations.

2.  Substantive Violations

On appeal, T.M.'s parents primarily argue that the April 2010 IEP violated the substantive requirements of the IDEA because Cornwall did not offer T.M. an ESY placement in his LRE. They also briefly mention several other possible substantive flaws in the April 2010 and August 2010 IEPs, which we address for completeness.

a. <u>LRE</u>

The IDEA's LRE requirement is laid out in 20 U.S.C. § 1412(a)(5)(A), titled "Least restrictive environment." Under that provision, a state receiving federal special education funding must ensure that:

> To the maximum extent appropriate, children with disabilities, including children in public or private institutions or other care facilities, are educated with children who are not disabled, and special classes, separate schooling, or other removal of children with disabilities from the regular educational environment occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(a)(5)(A). This requirement "expresses a strong preference for children with disabilities to be educated, to the maximum extent appropriate, together with their non-disabled peers." *Walczak*, 142 F.3d at 122 (internal quotation marks omitted). In enacting this provision, Congress sought to protect disabled children from being inappropriately segregated in special classrooms. *M.W.*, 725 F.3d at 145; *see Burlington*, 471 U.S. at 373 ("Congress was concerned about the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes."). The implementing regulations require school districts to ensure that a "continuum of alternative placements is available to meet the needs of children with disabilities," including

31

"instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions." 34 C.F.R. § 300.115(a), (b)(1); *see also* H.R. Rep. No. 108-779, at 186 (2004) (Conf. Rep.) (noting this requirement). After considering an appropriate continuum of alternative placements, the school district must place each disabled child in the least restrictive educational environment that is consonant with his or her needs.

Because every child is unique, "determining whether a student has been placed in the 'least restrictive environment' requires a flexible, fact-specific analysis." *Newington*, 546 F.3d at 113. We ask "first, 'whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child,' and if not, then 'whether the school has mainstreamed the child to the maximum extent appropriate.'" *Id.* at 120 (quoting *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir. 1989)). Factors relevant to the first question include:

> (1) whether the school district has made reasonable efforts to accommodate the child in a regular classroom; (2) the educational benefits available to the child in a regular class, with appropriate supplementary aids and services, as compared to the benefits provided in a special education class; and (3) the possible negative side effects of the inclusion of the child on the education of other students.

*M.W.*, 725 F.3d at 144 (quoting *Newington*, 546 F.3d at 120).

32

We have emphasized that the LRE requirement is not absolute. It does not require a school district to place a student in the single least restrictive environment in which he is capable of any satisfactory learning. *M.W.*, 725 F.3d at 145. Although the IDEA strongly prefers placing children in their least restrictive environment, "the presumption in favor of mainstreaming must be weighed against the importance of providing an appropriate education to handicapped students." *Newington*, 546 F.3d at 119 (quoting *Briggs v. Bd. of Educ.*, 882 F.3d 688, 692 (2d Cir. 1989)). The school must aim to minimize the restrictiveness of the student's environment while also considering the educational benefits available in that environment, "seek[ing] an *optimal* result across the two requirements." *M.W.*, 725 F.3d at 145.

While these two requirements are often in tension, they do not conflict in T.M.'s case. Applying the first prong of the *Newington* test, it is undisputed that T.M. was able to achieve a satisfactory education in a regular classroom. T.M. had already attended a full academic year of developmental kindergarten in 2009–2010 at Butterhill in a mainstream classroom. Moreover, Cornwall's April 2010 and August 2010 IEPs both recommended that T.M. should primarily be educated in a mainstream kindergarten classroom for the 2010–2011 academic year. Finally, T.M. did in fact attend a mainstream summer program at Butterhill

in the summer of 2010, and apparently showed satisfactory progress. The record thus clearly demonstrates that T.M. could succeed in a normal classroom environment with the use of supplementary aids and services. In addition, nothing in the record indicates that T.M. would obtain greater educational benefits from a more restrictive setting. We can therefore conclude from the first prong of the *Newington* test that a mainstream classroom was the least restrictive placement that was appropriate for T.M.'s educational needs.

It is equally clear that Cornwall did not offer T.M. an ESY placement in a mainstream classroom for the summer of 2010. Instead, both of the ESY placements that Cornwall offered—namely, Cornwall's own half-day special education program and the BOCES full-day special education program—were self-contained special education classrooms with no nondisabled students. According to our usual analysis, then, the April 2010 IEP violated the LRE requirement because it placed T.M. in a more restrictive educational setting for his ESY program than his disability required.

Cornwall argues, however, that the LRE requirement does not apply to the ESY component of a twelve-month educational program in the same way that it applies to the school-year component. Instead, Cornwall takes the position that the LRE requirement applies to an ESY placement only if the school district has a

less restrictive ESY placement available, but then excludes the disabled student from that less restrictive placement. On that view, because Cornwall did not already have a mainstream ESY program, it was not required to offer T.M. any mainstream ESY placement.

We reject Cornwall's contention that the LRE requirement should apply differently to the ESY component of a twelve-month educational program than it does to the school-year component. If a disabled child needs ESY services in order to prevent substantial regression, that child's ESY placement is an integral part of his or her twelve-month educational program. *See* 34 C.F.R. § 300.106(a)(1) (requiring school districts to ensure ESY services "are available as necessary to provide FAPE"); N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(k)(1) (describing eligibility for "12-month special services and/or programs"). We apply the same LRE requirement to the entire proposed educational program, examining whether any part of that program is more restrictive than necessary.

We therefore also reject Cornwall's contention that the LRE requirement is necessarily limited, in the ESY context, by what programs the school district already offers. Under the IDEA, a disabled student's least restrictive environment refers to the least restrictive educational setting consistent with that student's needs, not the least restrictive setting that the school district chooses to make

35

available. *See Walczak*, 142 F.3d at 122 ("[S]pecial education and related services must be provided in the least restrictive setting consistent with a child's needs."). In order to comply with the LRE requirement, for the ESY component of a twelve-month educational program as for the school-year component, a school district must consider an appropriate continuum of alternative placements, and then must offer the student the least restrictive placement from that continuum that is appropriate for the student's disabilities.

This interpretation of the LRE requirement flows directly from the text of the statute. The statutory provision imposes a broad duty on each state to ensure that "[t]o the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). It does not permit a school district to escape that broad duty in the ESY context just by choosing to offer only restrictive ESY environments. Moreover, the second half of the LRE provision makes it clear that the statute's focus is on the child's abilities, not the school district's existing programs. That second half requires the state to ensure that "special classes, separate schooling, or other removal of children with disabilities from the regular educational environment *occurs only when the nature or severity of the disability of* [*the*] *child is such that education in regular classes . . . cannot be achieved satisfactorily.*" *Id.* (emphasis added); *see also* 34 C.F.R.

§ 300.114(a)(2)(ii); H.R. Rep. No. 108-779, at 186 (2004) (Conf. Rep.). In other words, a disabled child should not be forced into a special classroom if he or she can be appropriately educated in a mainstream classroom. For ESY programs as for academic year programs, a child's LRE is primarily defined by the nature of the child's disabilities rather than by the placements that the school district chooses to offer.

Cornwall focuses on the phrase "other removal of children with disabilities from the regular educational environment," 20 U.S.C. § 1412(a)(5)(A), contending this phrase presumes the existence of a regular educational environment from which the child is being removed. It therefore argues that the LRE requirement applies only where the state already operates a mainstream classroom in which the student could be placed. On that view, the LRE requirement does not apply to T.M.'s ESY placement, because Cornwall does not operate any mainstream ESY program.

We are not persuaded by Cornwall's reading of the statutory language. By its plain terms, the statute prohibits all "special classes, separate schooling, *or* other removal of children with disabilities from the regular educational environment," unless the nature or severity of the child's disability requires one of these restrictive placements. 20 U.S.C. § 1412(a)(5)(A) (emphasis added). The

37

use of the disjunctive "or" shows that Congress intended to reach each of the three listed items individually. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979) ("Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise; here, it does not."); *see also Barscz v. Director*, 486 F.3d 744, 750 (2d Cir. 2007) (noting that phrases listed in the disjunctive "should be treated independently"). Here, it is undisputed that the ESY placement Cornwall offered T.M. was a "special class"; as described above, it was a special education program open only to students with disabilities. The plain statutory language of the LRE requirement prohibits placing a disabled child in such a "special class" unless that placement is appropriate because of the nature and severity of the child's disability. It is not limited to cases where the school already operates a mainstream educational environment.

In context, the phrase "other removal . . . from the regular educational environment" is simply a catchall. It gathers in all the other educational environments, beyond "special classes" and "separate schooling," that are more restrictive than "education in regular classes with the use of supplementary aids and services." 20 U.S.C. § 1412(a)(5)(A). It does not implicitly limit the LRE requirement to cases where the school district already provides a mainstream

38

classroom environment. After all, if Congress had really meant to limit the LRE requirement as Cornwall suggests, it would surely have said so directly rather than relying on an ambiguous implication from the word "removal." *Cf. Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("[C]ourts must presume that [Congress] says in a statute what it means and means in a statute what it says there.").

Moreover, Cornwall's interpretation would produce some results inconsistent with the statutory scheme. If the LRE requirement does not apply unless the school district operates a "regular educational environment" from which the student is "remov[ed]," then a school district that offers only a range of restrictive ESY programs (say, a special education day school and a special education program at a residential institution) could place all of its disabled children in its most restrictive summer program without the LRE requirement interfering. That result would contradict both the clear intent of the IDEA and also our caselaw. *See Walczak*, 142 F.3d at 132 ("'[E]ven in cases in which mainstreaming is not a feasible alternative,' the statutory preference for a least restrictive placement applies." (quoting *Sherri A.D. v. Kirby*, 975 F.2d 193, 206 (5th Cir. 1992))).

For another example, imagine a school district that operates only a mainstream ESY program and a highly restrictive residential ESY program. Under Cornwall's interpretation, the LRE requirement would apparently permit that school district to assign any student too disabled for a mainstream classroom to the residential institution, since the residential institution would be the least restrictive public setting available. That scenario, of course, is precisely what the IDEA was intended to prevent. *See Burlington*, 471 U.S. at 373 (noting that in enacting the IDEA's predecessor, "Congress was concerned about the apparently widespread practice of relegating handicapped children to private institutions or warehousing them in special classes").

We therefore conclude the IDEA's LRE requirement is not strictly limited by the range of ESY programs that the school district chooses to offer. Instead, the LRE requirement applies in the same way to ESY placements as it does to school-year placements. To meet that requirement, a school district first must consider an appropriate continuum of alternative placements; it then must offer the disabled student the least restrictive placement from that continuum that is appropriate for his or her needs.

The obligation to offer a continuum of appropriate placements is in fact spelled out explicitly in the federal regulations that implement the IDEA. Under

34 C.F.R. § 300.115(a), each school district "must ensure that a continuum of alternative placements is available to meet the needs of children with disabilities for special education and related services." That continuum must include at least "instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions." *Id.* § 300.115(b)(1); *see Bd. of Educ. v. Ill. State Bd. of Educ.*, 41 F.3d 1162, 1168 (7th Cir. 1994) ("In implementing the LRE mandate, each school district must maintain a continuum of program options which range from regular classrooms with supplementary aids to separate schools and residential facilities.").[6] A school district therefore cannot avoid the LRE requirement just by deciding not to operate certain types of educational environments; instead, it must provide a continuum of alternative placements that meet the needs of the disabled children that it serves.

---

[6] The legislative history confirms that Congress was fully aware of these regulations when it reauthorized and amended the IDEA in 2004. As the IDEIA conference committee report specifically noted: "The law requires that each public agency shall ensure that a continuum of alternative placements (instruction in regular classes, special classes, special schools, home instruction, and instruction in hospitals and institutions) is available to meet the needs of children with disabilities for special education and related services." H.R. Rep. No. 108-779, at 186 (2004) (Conf. Rep.) The House and Senate committees considering the IDEA Amendments of 1997 also indicated their approval of this "longstanding policy." H.R. Rep. No. 105-95, at 91 (1997); S. Rep. No. 105-17, at 11 (1997).

Of course, a school district need not itself operate all of the different educational programs on this continuum of alternative placements. The continuum may instead include free public placements at educational programs operated by other entities, including other public agencies or private schools. *See* 34 C.F.R. § 300.552 note (1998) (describing alternative methods of meeting the LRE requirement in the preschool context for school districts that do not operate programs for nondisabled preschool children)[7]; S. Rep. No. 94-168, at 22 (1975) ("[T]he Committee . . . does not intend that State and local educational agencies must be the sole providers of [educational] services. Particularly with respect to preschool services, while the local educational agencies are responsible under the Act for making available educational services to handicapped children, . . . public and private non-profit agencies currently providing preschool services should be utilized to meet the full services mandate."). We therefore agree with both parties that the IDEA does not require a school district to create a new mainstream summer program from scratch just to serve the needs of one disabled child. *See* *T.R. v. Kingwood Twp. Bd. of Educ.*, 205 F.3d 572, 579 (3d Cir. 2000) ("[A] district

---

[7] This regulation now appears, as amended, at 34 C.F.R. § 300.116. The explanatory note cited here was removed in 1999 "in light of the general decision to remove all notes from the[] final regulations." Assistance to States for the Education of Children with Disabilities and the Early Intervention Program for Infants and Toddlers with Disabilities, 64 Fed. Reg. 12406, 12639 (Mar. 12, 1999).

that does not operate a regular preschool program is not required to initiate one simply in order to create an LRE opportunity for a disabled child."); *Reusch v. Fountain*, 872 F. Supp. 1421, 1438 (D. Md. 1994) (noting that the IDEA does not require school districts to "create artificial LRE settings during the summer months"). Instead, the school district may choose to place the child in a private mainstream summer program, or a mainstream summer program operated by another public entity. Each school district thus has broad discretion over how it structures its alternative ESY placements; it can choose to operate its own educational ESY programs, or to offer the disabled children alternative placements in outside programs. But if a school district simply refuses to consider a sufficient continuum of possible ESY placements, and thereby denies a child a FAPE in his or her LRE, then it may be liable for reimbursement if the child's parents find an appropriate alternative placement. *See Carter*, 510 U.S. at 15–16; *Burlington*, 471 U.S. at 369–71.

Cornwall responds that it had no way to offer T.M. a placement in a mainstream ESY program operated by another entity, because (1) no public mainstream ESY programs existed in the area and (2) New York law prohibited it

from offering T.M. a placement in a private mainstream ESY program.[8] But even assuming those facts are true, they do not change Cornwall's obligation under the IDEA to consider a full continuum of alternative placements and then offer T.M. the least restrictive placement from that continuum that is appropriate for his needs. *See* 34 C.F.R. § 300.115(a). Because Cornwall failed to consider an appropriate continuum of alternative ESY placements and place T.M. in his LRE on that continuum, the ESY component of the April 2010 IEP was substantively inadequate.

Three aspects of our analysis here bear special emphasis. First, we repeat that the IDEA does not require public school districts to create any new ESY programs that they do not currently operate. It is entirely up to each state and each school district to decide how it will fulfill the IDEA's LRE requirement. Today as always, "public educational authorities who want to avoid reimbursing parents for the private education of a disabled child can do one of two things: give the child a free appropriate public education in a public setting, or place the

---

[8] Cornwall argues that N.Y. Comp. Codes R. & Regs. tit. 8, § 200.7 limited its ability to place T.M. in a private mainstream ESY program, by preventing the state Commissioner of Education from approving certain private educational programs to receive public special education funds. Even assuming *arguendo* that Cornwall has correctly construed this regulation—a matter that we need not decide—this state regulation does not relieve Cornwall of its obligation under the IDEA to consider a full continuum of alternative placements for T.M.

child in an appropriate private setting of the State's choice. This is IDEA's mandate, and school officials who conform to it need not worry about reimbursement claims." *Carter*, 510 U.S. at 15.

Second, we note that even if a school district fails to place a disabled student in an ESY program in his LRE, the student still will not be entitled to reimbursement unless he finds a private alternative ESY placement, proves that alternative placement was appropriate, and proves that equitable considerations favor reimbursement. *See Carter*, 510 U.S. at 15–16; *Burlington*, 471 U.S. at 369–71. If no appropriate alternative ESY placements are available, the school district need not fear reimbursement claims. Likewise, if practical issues make it objectively impossible or impracticable to provide a disabled student an ESY program in his LRE, the equitable calculus may weigh against reimbursement. We therefore do not believe that school districts will face any substantial burden from reimbursement claims for ESY programs—at least, no burden that Congress did not foresee and intend when framing the IDEA.

Third and finally, we reiterate that a school district is not required to offer every conceivable ESY environment that might be a particular student's LRE. Federal law requires only a "continuum of alternative placements," including at least "regular classes, special classes, special schools, home instruction, and

instruction in hospitals and institutions." 34 C.F.R. § 300.115(a), (b)(1). A school

district that offers an appropriate continuum of ESY placements, and places a

student in his or her LRE within that continuum, will not be liable just because

another imaginable environment might be less restrictive for that student.

*　　　　*　　　　*

In this case, both the district court and the SRO erred as a matter of law in

determining that Cornwall was not required to offer T.M. a mainstream ESY

program just because it does not already operate such a program. Once

Cornwall's CSE determined that T.M. required a twelve-month educational

program in order to prevent substantial regression in his development, *see* N.Y.

Comp. Codes R. & Regs. tit. 8, § 200.6(k)(1)(v), the IDEA required Cornwall to

offer T.M. that program in the least restrictive environment consistent with his

needs—namely, a mainstream classroom with supplementary aids and services.

Cornwall instead offered T.M. a more restrictive ESY placement in a self-

contained special education classroom. That proposed ESY placement violated

the LRE requirement, and so made the April 2010 IEP substantively inadequate.

Of course, that substantive violation alone does not entitle T.M.'s parents

to reimbursement for T.M.'s education at Butterhill. The parents must still satisfy

the second and third parts of the *Burlington/Carter* test, by showing that their alternative placement for T.M. at Butterhill was appropriate and that equitable considerations favor reimbursement. *See Carter*, 510 U.S. at 15–16; *Burlington*, 471 U.S. at 369–71. Because the district court erroneously concluded that there had been no LRE violation, it did not address these issues. We therefore vacate the district court's judgment and remand for that court to consider the remaining parts of the *Burlington/Carter* test in the first instance.[9]

If the district court finds that reimbursement is warranted, it should then fashion an appropriate reimbursement award. *See* 20 U.S.C. § 1415(i)(2)(C)(iii) (stating that the court "shall grant such relief as [it] determines is appropriate"). That award need not include tuition reimbursement for the entire year covered by the April 2010 IEP. If the LRE violation here affected only T.M.'s ESY program in July and August 2010, for instance, it may be appropriate to award him tuition reimbursement only for that period. We leave this issue open to the district court's discretion on remand.

---

[9] We reject the parents' argument that Cornwall was required to cross-appeal on the remaining parts of the *Burlington/Carter* test in order to preserve its right to contest these issues. A party need not cross-appeal in order to preserve alternative grounds for affirmance. *See Int'l Ore & Fertilizer Corp. v. SGS Control Servs.*, 38 F.3d 1279, 1286 (2d Cir. 1994).

b.  <u>Other Issues</u>

The parents cursorily mention three other issues that, they claim, also made the April 2010 and August 2010 IEPs substantively inadequate. We address those issues briefly to make clear that the district court need not consider them on remand.

First, the parents contend that the April 2010 IEP was substantively inadequate because T.M. would not have been "suitably grouped" with children of similar needs in the special education ESY program that Cornwall proposed. *See* N.Y. Comp. Codes R. & Regs. tit. 8, § 200.6(a)(3). Because the parents failed to raise this issue before the district court, however, we consider it forfeited. "[I]t is a well-established general rule that an appellate court will not consider an issue raised for the first time on appeal," unless it is "necessary to remedy an obvious injustice." *Greene v. United States*, 13 F.3d 577, 586 (2d Cir. 1994). Seeing no such injustice here, we leave undisturbed the SRO's determination that this "suitable grouping" claim fails.[10]

Next, the parents twice in their opening brief mention the fact that both the April 2010 and the August 2010 IEPs proposed to provide T.M.'s English and

_____

[10] We are not persuaded by the parents' novel contention that this "suitable grouping" argument and the LRE argument are so intertwined that raising the latter also raised the former.

48

math classes for the academic year on a "pull out" basis, in a separate 12:1+1 special education classroom. To the extent that these comments seek to challenge that aspect of the IEPs as overly restrictive, we consider the argument forfeited both by the parents' failure to raise it before the district court and by their failure to brief it thoroughly on appeal. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."); *Greene*, 13 F.3d at 586. In any case, we defer here to the SRO's determination (which is supported by the record) that T.M. "required a special class setting for those two subjects in order to be educated satisfactorily." J.A. 1175. We therefore affirm the SRO's determination that the proposed English and math classes were not overly restrictive.

Finally, the parents' opening brief twice characterizes the mainstream kindergarten class that Cornwall proposed in the April 2010 and August 2010 IEPs as unduly large. That phrase may be meant to challenge the district court's holding that Cornwall did not deny T.M. a FAPE by placing him in a kindergarten class with 25 students. If so, it is not enough to adequately raise the issue. *Norton*, 145 F.3d at 117. Moreover, even if the issue were squarely presented, the district court properly deferred to the SRO's well-reasoned

determination that the proposed class size was not too large for T.M.'s needs. We therefore affirm that aspect of the district court's decision.

3. Procedural Violations

T.M.'s parents also raise two alleged procedural violations affecting the April 2010 and August 2010 IEPs: Cornwall's failure to conduct an FBA or prepare a BIP while developing the April 2010 and August 2010 IEPs, and its failure to include parent counseling and training in the April 2010 IEP as part of the proposed 2010 ESY program. Because these two issues might affect the district court's decision on remand, we address them now. We conclude that neither asserted procedural violation can justify reimbursement.

a. FBA/BIP

The IDEA requires a school district to "consider the use of positive behavioral interventions and supports, and other strategies" to address behavior by a disabled child that "impedes the child's learning or that of others." 20 U.S.C. § 1414(d)(3)(B)(i). New York state regulations go beyond this floor set by the IDEA; they require a school district to conduct a full FBA for a student who exhibits behavior that impedes learning, and to develop a BIP to address that behavior. *See M.W.*, 725 F.3d at 139–40; *R.E.*, 694 F.3d at 190; *see also* N.Y. Comp.

Codes R. & Regs. tit. 8, §§ 200.4(b)(1)(v), 200.22(b). Although the failure to conduct an adequate FBA is a "serious procedural violation," it "does not rise to the level of a denial of a FAPE if the IEP adequately identifies the problem behavior and prescribes ways to manage it." *R.E.*, 694 F.3d at 190; *see also M.W.*, 725 F.3d at 140.

Here, the IHO found that the district was required to conduct an FBA and develop a BIP in order to address T.M.'s "interfering and inappropriate behaviors," including "distractibility, inattentiveness and difficulty remaining on-task, noncontextual vocalizations, finger twirling, etc." J.A. 1073. The SRO disagreed, finding that "any behaviors exhibited by [T.M.] were not of such a frequency or degree so as to impede his learning or that of others," and that his IEPs correctly identified his problematic behavior and "adequately planned to meet [his] behavioral needs." J.A. 1170, 1172. The SRO therefore concluded that Cornwall did not deny T.M. a FAPE by failing to conduct an FBA or develop a BIP.

The SRO's decision turns on her evaluation of whether T.M.'s behavior would interfere with his learning, and whether Cornwall had taken adequate steps to address that behavior. These fact-specific educational questions are

51

"precisely the type of issue upon which the IDEA requires deference to the expertise of the administrative officers." *A.C. ex rel. M.C. v. Bd. of Educ.*, 553 F.3d 165, 172 (2d Cir. 2009) (quoting *Grim v. Rhinebeck Cent. Sch. Dist.*, 346 F.3d 377, 382 (2d Cir. 2003)). Here, the SRO's decision is well-reasoned and supported by the record, and so the district court was correct to defer to her considered judgment. We therefore affirm the district court's holding that Cornwall did not deny T.M. a FAPE by failing to conduct an FBA or prepare a BIP.

b. Parent Counseling and Training

T.M.'s parents next argue that the April 2010 IEP was inadequate because it failed to provide for parent counseling and training as part of T.M.'s 2010 ESY program, as required by N.Y. Comp. Codes R. & Regs. tit. 8, § 200.13(d). We have previously described the failure to provide parent counseling as a procedural violation that is "less serious than the omission of an FBA," *R.E.*, 694 F.3d at 191, and noted that a "failure to provide counseling ordinarily does not result in a FAPE denial or warrant tuition reimbursement," *M.W.*, 725 F.3d at 142.

T.M.'s parents did not raise this issue in either their July 2010 due process complaint notice or their September 2010 amended notice. They also failed to raise it before the district court. As such, this argument is forfeited. *See* 20 U.S.C. §

52

1415(f)(3)(B) ("The party requesting the due process hearing shall not be allowed

to raise issues . . . that were not raised in the [due process complaint] notice . . .

."); *Greene*, 13 F.3d at 586 (2d Cir. 1994). Moreover, even if T.M.'s parents had

properly preserved this argument, Cornwall's failure to include parent

counseling and training as part of T.M.'s ESY program was not a sufficiently

serious procedural violation to deny T.M. a FAPE. *See M.W.*, 725 F.3d at 141–42;

*R.E.*, 694 F.3d at 191.

### c.  Cumulative Effect

"[E]ven minor violations may cumulatively result in a denial of a FAPE."

*R.E.*, 694 F.3d at 191. Here, however, the procedural violations that T.M.'s parents

raise did not deny T.M. a FAPE either individually or cumulatively. These

asserted violations therefore cannot sustain the claim for reimbursement.

### 4.  Conclusion

For the reasons given above, we hold that the April 2010 IEP violated the

IDEA's LRE requirement by offering T.M. an ESY placement in a self-contained

special education classroom rather than a mainstream classroom. We reject the

parents' other claims of procedural and substantive inadequacy in the April 2010

and August 2010 IEPs. We therefore vacate the judgment below, and remand for

the district court to determine whether tuition reimbursement is appropriate under the *Burlington/Carter* test and to fashion an appropriate remedy.

B.    The Cross-Appeal

On the cross-appeal, Cornwall contends that the district court erred by requiring it to continue reimbursing T.M.'s parents for pendency services that they obtained for T.M. from private providers after the district offered to provide those pendency services directly. We agree.

1.  Legal Standard

The IDEA provides district courts with broad discretion to "grant such relief as the court determines is appropriate" in order to carry out its statutory mandate. 20 U.S.C. § 1415(i)(2)(C)(iii); *see Burlington*, 471 U.S. at 369. We review the district court's decision to enter a preliminary injunction in an IDEA case for abuse of discretion. *Malkentzos v. DeBuono*, 102 F.3d 50, 54-55 (2d Cir. 1996). A district court abuses its discretion when its decision (1) rests on an error of law or a clearly erroneous factual finding, or (2) cannot be found within the range of permissible decisions. *Johnson v. Univ. of Rochester Med. Ctr.*, 642 F.3d 121, 125 (2d Cir. 2011).

As relevant here, the IDEA's pendency provision states that "during the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in [his or her] then-current educational placement." 20 U.S.C. § 1415(j). That provision reflects Congress's decision that all disabled children should keep their existing educational program until any dispute over their placement is resolved. *See Mackey ex rel. Thomas M. v. Bd. of Educ.*, 386 F.3d 158, 160–61 (2d Cir. 2004); *see also Honig v. Doe*, 484 U.S. 305, 323–25 (1988). It therefore requires a school district to continue funding whatever educational placement was last agreed upon for the child until the relevant administrative and judicial proceedings are complete. *Mackey*, 386 F.3d at 163.

Under our precedent, "the term 'educational placement' refers only to the general type of educational program in which the child is placed." *Concerned Parents & Citizens for the Continuing Educ. at Malcolm X (PS 79) v. N.Y.C. Bd. of Educ.*, 629 F.2d 751, 753 (2d Cir. 1980); *see also N.D. v. Haw. Dep't of Educ.*, 600 F.3d 1104, 1115–16 (9th Cir. 2010). That is, the pendency provision does not guarantee a disabled child the right to remain in the exact same school with the exact same service providers while his administrative and judicial proceedings are pending.

55

Instead, it guarantees only the same general level and type of services that the disabled child was receiving. *See Concerned Parents*, 629 F.2d at 756 (finding no change in educational placement where disabled students were transferred from one school to another but "remain[ed] in the same classification, the same school district, and the same type of educational program special classes").

2. Analysis

As described above, Cornwall originally refused to provide T.M. any pendency services, relying on the October 2009 stipulation of settlement. After the IHO's decision, however, Cornwall conceded that T.M. was entitled to the services described in his May 2009 IEP as pendency services. It therefore reimbursed T.M.'s parents for the amount they had spent on those services in the 2010–2011 year. It then offered to provide the exact same services directly through its own providers for the 2011–2012 year, rather than paying T.M.'s private providers for those services. T.M.'s parents rejected that offer, insisting that Cornwall was obligated to continue paying to provide T.M's services through the private providers that he was already using.

The district court agreed with T.M.'s parents. It held that because Cornwall had initially refused to provide T.M.'s pendency services directly, it could not

now force T.M. to switch from his private providers to Cornwall's own providers. "To change T.M.'s providers," the district court held, "would deprive him of the stability and consistency afforded by the pendency provision." J.A. 1396. It therefore ordered Cornwall to continue paying for T.M. to obtain his pendency services from his private providers until these proceedings are finally adjudicated.

We conclude that the district court erred by ordering Cornwall to pay the full cost of providing T.M.'s pendency services through private providers. The IDEA's pendency provision does not entitle a disabled child to keep receiving services from the exact same service providers while his proceedings are pending; instead, it only entitles the child to receive the same general type of educational program. *Concerned Parents*, 629 F.2d at 753. It is up to the school district to decide how to provide that educational program, at least as long as the decision is made in good faith. *See id.* at 756.

The same rule remains true even where, as here, a school district initially refuses to provide pendency services directly. Although Cornwall was wrong to deny T.M. pendency services in the first place, the IDEA does not bar Cornwall

from subsequently correcting its mistake and offering to provide the required pendency services directly.

The district court therefore erred in believing that Cornwall was obligated to afford T.M. "stability and consistency" by keeping him with the same private service providers. Cornwall satisfied its duties under 20 U.S.C. § 1415(j) by reimbursing T.M.'s parents for the amount they spent on his pendency services in the 2010–2011 year, and by offering to provide the required pendency services directly from that point onwards. When T.M.'s parents rejected Cornwall's offer to provide pendency services directly for the 2011–2012 year, they took responsibility for the cost of obtaining those services from private providers. *Cf. Burlington*, 471 U.S. at 373–74 ("[P]arents who unilaterally change their child's placement during the pendency of review proceedings, without the consent of state or local school officials, do so at their own financial risk."). Cornwall therefore cannot be required to bear whatever additional cost was incurred by the parents' decision to keep T.M. with his private service providers rather than accepting the same services directly from Cornwall.

At the same time, under the circumstances presented here, we believe it is within the district court's authority to order Cornwall to reimburse T.M.'s

parents for pendency services up to the amount that it would have cost Cornwall

itself to provide the required pendency services from July 2011 through the end

of the present school year. That remedy would leave Cornwall no better and no

worse off than it would have been if T.M.'s parents had accepted for T.M. the

pendency services that Cornwall was required to provide. *Cf. Burlington*, 471 U.S.

at 370–71 ("Reimbursement merely requires the Town to belatedly pay expenses

that it should have paid all along and would have borne in the first

instance . . . ."). It would also avoid the unfairness of denying T.M.'s parents all

reimbursement for the private services that they obtained for T.M. after the IHO,

and later the district court, assured them that Cornwall was required to pay for

those services. Lastly, it would account for the fact that by refusing to provide

T.M.'s pendency services in the first instance, Cornwall led T.M. to develop a

deeper relationship with his private providers, and so made it more difficult for

him to later accept pendency services directly from Cornwall. We leave it to the

district court on remand to decide whether such a reimbursement award is

appropriate, and if so, to calculate the amount that Cornwall would have spent to

provide T.M.'s pendency services directly from July 2011 through the end of the

current school year. If the present dispute extends into future school years, of

59

course, and Cornwall offers to provide T.M.'s pendency services directly for those years, then T.M.'s parents must either accept that offer for T.M. or else take on the full cost of obtaining the necessary services from private providers.

## CONCLUSION

For the reasons stated above, the judgment of the district court is **VACATED** and the case is **REMANDED** for further proceedings consistent with this opinion.