Colleen McMahon, Chief Judge
Plaintiffs Maria Navarro Carrilo and Jose Garzon, the parents of M.G., an eleven-year-old girl with a serious brain injury, seek injunctive relief pursuant to the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq, against Defendant New York City Department of Education (the "DOE"). Plaintiffs seek an injunction vacating a March 5, 2019 pendency order, and ordering that the DOE fund M.G.'s pendency placement at iBrain for the remainder of the 2018-19 school year, until a final adjudication on Plaintiffs' due process complaint against the DOE claiming that iBrain is M.G.'s "appropriate placement" has been resolved.
For the reasons discussed below, the Court grants Plaintiffs' request for a preliminary injunction.
I. Overview of Relevant Principals of IDEA Jurisprudence
The IDEA assures that children with disabilities have available "a free appropriate public education which emphasizes special education and related services designed to meet their unique needs."
*445 Bd. of Educ. of Pawling Cent. Sch. Dist. v. Schutz, 290 F.3d 476, 481 (2d Cir. 2002) (quoting Cedar Rapids Cmty. Sch. Dist. v. Garret F. , 526 U.S. 66, 68, 119 S.Ct. 992, 143 L.Ed.2d 154 (1999) ). The statute mandates that the school district of residence of a child with a disability offer that student a "free appropriate public education" ("FAPE"). See 20 U.S.C. § 1400(d)(1)(A). A FAPE is defined as special education and related services that are provided under public expense; meet the standards of the state educational agency; include an appropriate school education in the state involved; and are in conformity with the student's "individualized education program" ("IEP"). See id. § 1401(9).
A student's IEP is developed collaboratively among parents, educators, a representative of the local education agency, and other specialists, as required; this group is the "IEP team." Id. § 1414(d)(1)(B); Schutz, 290 F.3d 476 at 481. The IEP includes a statement of the student's present levels of achievement, measurable annual goals, a method for measuring the student's progress, and a statement of the student's required special education and related services, including supplementary aids and services, among other things. See 20 U.S.C. § 1414(d)(1)(A).
A. Due Process Requirements
The IDEA recognizes that all parties may not always agree with the IEP generated by the IEP team, so "states are required to develop procedural safeguards to 'guarantee parents both an opportunity for meaningful input into all decisions affecting their child's education and the right to seek review of any decisions they think inappropriate.' " Schutz, 290 F.3d at 481 (quoting Honig v. Doe, 484 U.S. 305, 311-12, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) ). A parent or agency may file a due process complaint "with respect to any matter relating to identification, evaluation or educational placement of the child, or the provision of a [FAPE]." 20 U.S.C. § 1415(b)(6)(A) ; see also 34 C.F.R. 300.507(a)(1) (2007) ("A parent or a public agency may file a due process complaint on any of the matters described in § 300.503(a)(1) and (2) (relating to the identification, evaluation or educational placement of a child with a disability, or the provision of FAPE to the child.).").
Each state has in place its own procedures to implement the review process. In New York, there are two levels of administrative tribunals. First, an Independent Hearing Officer ("IHO") hears the due process complaint and issues a finding of fact and decision. That finding and decision may then be appealed to a State Review Officer ("SRO") of the state department of education. See N.Y. Comp. Codes R. & Regs. Tit. 8, § 200.5(j)-(k) ; see also Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ. , 297 F.3d 195, 197 (2d Cir. 2002). The SRO's decision is "final and concludes the state administrative review." Schutz, 290 F.3d at 481. The parent or DOE may then seek judicial review by a state or federal court once they have exhausted these administrative remedies. See 20 U.S.C. § 1415(i) ; 34 C.F.R. § 300.516 ; N.Y. Educ. L. § 4404(3).
B. The Pendency Provision
During the pendency of due process review hearings, parents have the right to have the child "stay put" in his or her current educational placement. Section 1415(j) of the IDEA (the pendency or "stay put" provision) is as follows:
[D]uring the pendency of any proceedings conducted pursuant to this section, unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current *446 educational placement of the child, or, if applying for initial admission to a public school, shall, with the consent of the parents, be placed in the public school program until all such proceedings have been completed.
29 U.S.C. § 1415(j). This right applies "regardless of whether [the] case is meritorious or not. " Mackey ex rel. Thomas M. v. Bd. of Educ. For Arlington Cent. Sch. Dist. , 386 F.3d 158, 161 (2d Cir.) (emphasis in original).
"The purpose of the pendency provision is to provide stability and consistency in the education of a student with a disability," Arlington Cent. Sch. Dist, 421 F. Supp. 2d at 696, and to "maintain the educational status quo while the parties' dispute is being resolved," Doe v. E. Lyme Bd. of Educ. , 790 F.3d 440, 452 (2d Cir. 2015) (quoting T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist. , 752 F.3d 145, 152 (2d Cir. 2014) ). Parents can secure funding for a "stay put" placement in a private facility if they have already received an administrative or judicial decision confirming that the private school was an appropriate placement for a prior school year; this is true even if a school district is arguing that a public school is indeed the appropriate placement. See Schutz, 290 F.3d at 484-85 ; New York City Dep't of Educ. v. S.S. , No. 09 CIV. 810(CM), 2010 WL 983719, at *1, *6 (S.D.N.Y. Mar. 17, 2010) ("Part of the 'stay put' scheme is that responsibility for private school tuition 'stays put' as well.").
a) "Then-Current Educational Placement"
The pendency inquiry requires identification of the student's then current educational placement. See Zvi D. by Shirley D. v. Ambach, 694 F.2d 904, 906 (2d Cir. 1982) ; "Then-current educational placement" is not defined by statute and originally, it was construed as the last agreed-upon IEP or placement. See, e.g., Arlington Cent. Sch. Dist, 421 F. Supp. 2d at 697. More recently, the Second Circuit has broadened the term to mean either: "(1) typically the placement described in the child's most recently implemented IEP; (2) the operative placement actually functioning at the time ... when the stay put provision of the IDEA was invoked; [or] (3) [the placement at the time of] the previously implemented IEP." Mackey, 386 F.3d at 163 ; see also Dervishi v. Stamford Bd. of Educ. , 653 F. App'x 55, 57 (2d Cir. 2016) (summary order) (citing Mackey 's definition of "then-current educational placement"); Doe, 790 F.3d at 452 (same).
Each of these definitions depends on the construction of the term "educational placement," which has a history of broad construction.
The seminal case is Concerned Parents & Citizens for the Continuing Ed. at Malcolm X (PS 79), et al. v. New York City Bd. of Ed. , 629 F.2d 751 (2d Cir. 1980). In Concerned Parents , the Second Circuit addressed the meaning of a change in "educational placement" when examining "whether the transfer of handicapped children in special classes at one school to substantially similar classes at other schools within the same school district constitute[d] a change in '[educational] placement' sufficient to trigger [IDEA's] prior notice and hearing requirements." Id. at 753 (emphasis added). The court found that the term " 'educational placement' refers only to the general type of educational programming in which the child is placed," rather than to any particular location. Id. ; see also AW ex rel. Wilson v. Fairfax Cty. Sch. Bd. , 372 F.3d 674, 682 (4th Cir. 2004) ("Consideration of the structure and the goals of the IDEA as a whole, in addition to its implementing regulations, reinforces our conclusion that the touchstone of the *447 term 'educational placement' is not the location to which the student is assigned but rather the environment in which educational services are provided."); Bd. of Educ. of Cmty. High Sch. Dist. No. 218, Cook Cty., Ill. v. Illinois State Bd. of Educ. , 103 F.3d 545, 549 (7th Cir. 1996) ("We accept as the outer parameters of 'educational placement' that it means something more than the actual school attended by the child and something less than the child's ultimate educational goals."). Ultimately, the Concerned Parents court found that the transfer of children from one school to another was not a change in the educational placement because the students remained in the "same classification, the same school district, and the same type of educational program special classes." Concerned Parents, 629 F.2d at 756.
Nearly twenty-five years later, the Second Circuit interpreted the Concerned Parents definition of "educational placement" to also apply in the context of the "stay put" provision. See T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist. , 752 F.3d 145, 171 (2d Cir. 2014) (citing Concerned Parents ). The pendency provision "does not require that a student remain in a particular site or location." G.R. ex rel. B.S. v. New York City Dep't of Educ. , No. 12 CIV. 441, 2012 WL 310947, at *6 (S.D.N.Y. Jan. 31, 2012). It guarantees "only the same general level and type of services that the disabled child was receiving" and does not create a right (or requirement) that the student remain in the "exact same school with the exact same service providers." T.M. ex rel A.M. , 752 F.3d at 171 ; see also G.R. ex rel. B.S. , 2012 WL 310947, at *6 ; In re Beau II, 95 N.Y.2d 234, 240, 715 N.Y.S.2d 686, 738 N.E.2d 1167 (N.Y. 2000) ("[A] change in placement occurs if a child with a disability is transferred 'from one type of program to another,' but not if a child is transferred to another school offering equivalent educational programs."); S.R.O. Appeal No. 02-031 (2002). In the pendency context, " '[e]ducational placement' refers to the general educational program-such as the classes, individualized attention and additional services a child will receive." T.Y. v. New York City Dep't of Educ. , 584 F.3d 412, 419 (2d Cir. 2009) ; see also S.Y. v. New York City Dep't of Educ. , 210 F. Supp. 3d 556, 571 (S.D.N.Y. 2016) ; L.L. v. New York City Dep't of Educ. , No. 15-CV-4146 (JPO), 2016 WL 4535037, at *7 (S.D.N.Y. Aug. 30, 2016) (student is entitled to the "educational program at the level described in the last IEP agreed upon by the parent and the District" not the right to remain at a specific school). As one Second Circuit court has recognized, this interpretation is further reinforced by the U.S. DOE's own construction of the term. See K.L.A. v. Windham Se. Supervisory Union, 371 F. App'x 151, 154 (2d Cir. 2010) (citing U.S.D.O.E. Comments, 71 Fed. Reg. at 46687 (Aug. 14, 2006) ("The Department's longstanding position is that placement refers to the provision of special education and related services rather than a specific place, such as a specific classroom or specific school.")).
Based on this construction of "educational placement" - and because a school district has a responsibility to fund private education that was approved in a prior IEP, see, e.g., Schutz, 290 F.3d at 484-85 - parents may move their child from a previously approved private facility to another private facility and still receive "stay put funding" as long as the new facility has the same "general type of educational programming" as the approved facility. See, e.g., Cruz v. New York City Dep't of Educ. , No. 18 CIV. 12140 (PGG), 2019 WL 147500, at *10 (S.D.N.Y. Jan. 9, 2019). Indeed, IHOs and SROs, when faced with *448 these circumstances, have acknowledged that funding for a different private facility is permissible if the parents (or the individual responsible for unilaterally moving the student) can demonstrate that the two schools' educational programs are "substantially similar," relying on the language of Concerned Parents . Concerned Parents , 629 F.2d at 756 (2d Cir. 1980) ; see also SRO Appeal No. 16-020 (2016); SRO Appeal No. 02-031 (2002).
When determining whether two programs are "substantially similar," hearing officers have relied on a slate of factors that the U.S. DOE's Office of Special Education Programs ("OSEP") has identified as relevant when determining whether a move from one facility to another constitutes a "change in educational placement." The factors include: whether the educational program in the student's IEP has been revised; whether the student will be educated with nondisabled peers to the same extent; and whether the student will have the same opportunities to participate in nonacademic and extracurricular services. See Letter to Fisher, 21 IDELR 992 [OSEP 1994].
II. Statement of Relevant Facts
Plaintiffs Maria Navarro Carrilo and Jose Garzon are the parents of M.G. (Decl. of Karl J. Ashanti ("Ashanti Decl."), Dkt. No. 15, ¶ 1.) M.G. is an 11-year-old girl, who is classified as a student with a disability. (Id. ¶¶ 2, 3.) She has a brain injury, which has caused her to experience global developmental impairments. (Id. ¶ 2.) M.G. is non-verbal, non-ambulatory, has highly intensive management needs, and requires a high degree of individualized attention, instruction, and intervention. (Id. ) M.G. has several impairments in cognition, language, memory, attention, reasoning, abstract thinking, judgment, problem solving, information processing, and speech, all of which affect her learning. (Id. Ex. A ("iHope IEP") at 1.)
A. The 2017-2018 School Year: iHope
The record lacks any details as to whether an IEP was ever finalized for M.G. for the 2017-18 school year. All that we know is that the district engaged in an "IEP process" that Plaintiffs later claimed was "substantively and procedurally flawed." (Ashanti Decl. Ex. C ("Apr. 27 FOFD") at 2.)
Plaintiffs unilaterally enrolled M.G. at the International Academy of Hope ("iHope") for the 2017-18 school year. (Id. at 2.) iHope is a private school that provides intensive services to children who have sustained brain injuries or have brain-based disorders; there, M.G. received academic and related services. (Ashanti Decl. ¶ 4.)
After enrolling M.G. at iHope, Plaintiffs filed a due process complaint alleging that the DOE failed to offer a FAPE to M.G. for the 2017-18 school year because "the IEP process was substantively and procedurally flawed." (Apr. 27 FOFD at 2.)
While Plaintiffs' due process complaint was being litigated, M.G. remained at iHope, where she received academic and related services pursuant to an educational plan developed by iHope staff ("iHope proposed IEP"). (Ashanti Decl. Ex. A ("iHope proposed IEP").) She was enrolled in a twelve-month academic program with an extended school day. (Ashanti Decl. ¶ 4.) Her iHope proposed IEP required that she be placed in a modified environment with reduced visual and sound distractions, in combination with individual and small group instruction. (iHope proposed IEP at 1.) Specifically, she was in a 6:1:1 class with a 1:1 paraprofessional. (Id. at 3.) M.G. also received additional related services. On a weekly basis, she required: (1) five one-hour individual sessions with physical *449 therapy; (2) two one-hour individual sessions with vision services; (3) three one-hour individual sessions with occupational therapy; (4) three one-hour individual sessions and two one-hour small group sessions with speech-language therapy; and (5) two one-hour individual sessions with assistive technology programming. (Id. at 36.) Finally, she required parent counseling and training group sessions once per month. (Id. at 36.)
In addition to her academic and related services, M.G. received special transportation services that consisted of a 1:1 transportation paraprofessional, a wheelchair accessible vehicle, air conditioning, porter service, and limited travel time of no more than 60 minutes. (See Ashanti Decl. ¶ 5; iHope IEP at 38; Ashanti Decl. Ex. B.)
On April 27, 2018, IHO Suzanne Carter ("IHO Carter") issued a decision on Plaintiffs' due process complaint, finding that iHope was M.G.'s "appropriate placement" for the 2017-18 school year, as it provided an "intensive education designed to serve [M.G.'s] intellectual and physical needs." (Apr. 27 FOFD at 3.) IHO Carter specifically pointed out that at iHope, M.G. had an extended school day, received extended related service sessions with rest breaks, and was taught using a "direct one-on-one instruction model that include[d] pacing, frequent opportunity to respond, feedback and, and reinforcement to maintain student engagement and ensure learning," (Id. at 3-4.) IHO Carter ordered the DOE to fund M.G.'s tuition and related services for the 2017-18 school year, despite the fact that M.G. had been enrolled without guarantee of district funding. (Id. at 4.) She also ordered that the "CSE reconvene and draft an IEP that incorporates all items of the iHope proposed IEP dated February 23, 2017." (Id. ) The DOE did not appeal this decision. (Ashanti Decl. ¶ 7.)
B. M.G.'s 2018-2019 IEP
On March 19, 2018, prior to IHO Carter's decision that iHope was the appropriate placement for M.G., the DOE issued an IEP for M.G. for the 2018-2019 year (the year at issue in this case), recommending that M.G. be placed at "the School of Science and Applied Learning," a New York City public school, in a 12:1+(3:1) classroom. (Ashanti Decl. Ex. H ("2018-19 Due Process Compl.") at 2.) Plaintiffs claim that the IEP review meeting was not at a time that was mutually agreeable with Plaintiffs, and that there were numerous other substantive and procedural errors in developing the IEP. (Id. at 2-3.)
Despite the fact that IHO Carter issued her decision on April 27, 2018 finding that iHope was M.G.'s appropriate placement and requiring the CSE to reconvene to draft a new IEP that incorporated the items in the iHope proposed IEP, the record suggests that the CSE never reconvened to reconsider the 2018-19 IEP it has issued a month earlier. (Id. ) Thus, presumably, M.G.'s operative IEP for the 2018-19 school year is the IEP issued in March of 2018, recommending that she be placed in a public school in a 12:1+(3:1) classroom.
C. 2018-2019 School Year: Transfer to iBrain
On June 21, 2018, Plaintiffs sent the DOE a 10-day Notice letter indicating that they intended to unilaterally move M.G. from iHope to the International Institute for the Brain ("iBrain") for the 2018-19 school year, (Ashanti Decl. ¶ 8; id. Ex. D.) In this letter, Plaintiffs asserted that the DOE that had not offered M.G. an appropriate program or placement for the 2018-19 school year. (Ashanti Decl. Ex. D.) They further claimed that the DOE had not conducted an annual IEP for M.G., despite Plaintiffs' repeated request that the DOE Committee on Special Education ("CSE")
*450 conduct a committee meeting to develop an appropriate and timely IEP for the upcoming school year. (Id. )
The record contains no information as to why Plaintiffs decided to move M.G. from iHope to iBrain, which was a new school founded by the same individual who founded iHope and which contained many of the same students and staff.
On July 9, 2018, M.G. started attending iBrain. (Ashanti Decl. ¶ 9.)
That same day, Plaintiffs brought an administrative due process complaint against the DOE, requesting that the DOE recognize M.G.'s pendency placement at iBrain and find that iBrain is her appropriate placement. (2018-19 Due Process Compl.; see also infra I.D.)
M.G. has remained at iBrain while her pendency and related due-process claim are being litigated. The district has refused to pay M.G.'s tuition and related expenses in the meantime, on the ground that iBrain is not her "pendency" placement - iHope is.
1. M.G.'s Experience at iBrain
As at iHope, at iBrain, M.G. has an extended school day and is part of a twelve-month academic program. (Id. ¶ 10.) She is enrolled in a 6:1:1 class. (Ashanti Decl. Ex. F. ("iBrain IEP") at 43.) The proposed educational plan developed for M.G. at iBrain ("iBrain proposed IEP") requires the same number of physical therapy, occupational therapy, and vision education services as her iHope proposed IEP from the previous year. (Id. at 41.) The iBrain proposed IEP differs from the iHope proposed IEP in that it requires four (rather than three) one-hour individual sessions with speech-language therapy per week (the number of group sessions remains the same) and one (rather than two) one-hour individual sessions with assistive technology per week. At iBrain, as at iHope, M.G. receives special transportation services consisting of a 1:1 transportation paraprofessional, a wheelchair accessible vehicle, air conditioning, porter services, and limited travel time of no more than one hour each way per day. (Ashanti Decl. ¶ 11.)
When M.G. started attending iBrain in July 2018, the school was not fully staffed. Relevant for M.G., there was no social worker for the first month, and there was no vision services specialist for the first two and a half months. (Ashanti Decl. Ex. K ("March 5 IOP") at 4-5.) As a result, M.G. missed one parent counseling session and about twenty individual vision services sessions, not an insignificant number. During the period in which it did not have a vision services provider, the school attempted to make up for the lack of services by "strategically implementing [M.G.'s] IEP[ ] and presenting materials in a specific way throughout the school day" to address the skills that would have been addressed in these sessions. (Ashanti Decl. Ex. J. ("Jan. 14 Tr.") 156:18-159:13 (testimony by iBrain's director of special education).) The vision services provider began in September 2018. Since the vision services provider was hired, M.G. has been given make up sessions during periods of time in her schedule that are for review or other non-required activities. (Id. 165:17-20.) All sessions will be made up by the end of the school year. (Id. 156:3-6.) The one missed parent counseling session has also been made up. (Id. 130:3-10.)
D. Plaintiffs' Due Process Complaint for 2018-19 School Year
Plaintiffs filed their Due Process complaint for the 2018-19 school year on July 9, 2018. (2018-19 Due Process Compl.) The My 2018 Complaint alleges, among other things, that the DOE did not provide M.G. with a FAPE for the 2018-19 school year.
*451 (Id. at 2.) Plaintiffs specifically argue that M.G.'s 2018-19 IEP - which was issued by the DOE one month prior to the IHO's April 2018 decision that iHope was the proper placement for M.G. - did not provide for a FAPE, as it recommended placement at "the school of Science and applied Learning in a 12:1 (+3:1) classroom." (Id. ) Plaintiffs also reject this IEP because it was developed without Plaintiffs' participation, as required under the IDEA. (Id. ) Plaintiffs request the following relief: (1) payment by the School District directly to [iBrain] for the cost of Full Tuition for the 2018-2019 extended school year; (2) transportation costs including a 1:1 travel aide; (3) reconvention of an annual review meeting for M.G.; and (4) attorneys' fees and related fees and disbursements, should Plaintiffs' prevail. (Id. at 3.)
IHO Carter - the same IHO who heard Plaintiffs' 2017-18 administrative Due Process complaint - was assigned to hear this case after another hearing officer recused. (Ashanti Decl. ¶ 13.).
The first matter for IHO Carter to determine was the proper pendency placement for M.G. while the due process complaint is being litigated. In their due process complaint, Plaintiffs requested a pendency order requiring the DOE to fund M.G.'s pendency placement at iBrain, including special transportation accommodations. (2018-19 Due Process Compl. at 1.) The DOE argued that the parents had no right to pendency once they removed the student from iHope to place her at iBrain, and further, that if the student was not permitted to re-enroll in iHope, the parent had the burden to establish why. (March 5 IOP at 3.)
On December 19, 2018 and January 14, 2019, IHO Carter heard evidence about M.G.'s pendency placement. (Ashanti Decl. ¶ 15.) She focused the hearing on the question of whether iBrain was "substantially similar" to iHope, such that M.G.'s switch from iHope to iBrain did not constitute a "change in her educational placement." (March 5 IOP at 3.)
Plaintiffs argued that M.G.'s pendency placement should be iBrain for the 2018-19 school year, based on the substantial similarity between her current educational program at iBrain and her educational program at iHope for the 2017-18 school year. (Id. ) iBrain's clinical director, Dr. Mensah, and its director of special education, Ms. Semm, testified for Plaintiffs; Plaintiffs also relied on an affidavit submitted by Dr. Mensah, in which she stated the educational programs offered to students at iBrain and iHope "are essentially identical," and that many of the same students and staff who were at iHope had moved to iBrain upon iBrain's inception in 2018. (Ashanti Decl. Ex. I ¶ 8; March 5 IOP at 3-5.) The DOE argued that because iBrain was not fully staffed at its inception, it failed to provide all of the "related services" that were provided at iHope and, therefore, was not a "substantially similar" program.
On March 5, 2019, IHO Carter issued an Interim Order on Pendency ("March 5 IOP"), denying Plaintiffs' request for pendency at iBrain and finding that M.G.'s pendency placement is iHope. (March 5 IOP at 7.).
First, IHO Carter rejected the DOE's argument that Plaintiffs had to establish that the student was not permitted to re-enroll in iHope, finding that the reasoning for the decision to transfer a student from one nonpublic school to another "may be relevant, it is unlikely to be determinative." (Id. at 3.) Instead, she focused her inquiry on whether iHope and iBrain were "substantially similar." (Id. )
*452 Next, IHO Carter found that the record did not establish that the "program implemented at iBrain - at the time of the impartial hearing - was substantially similar to the pendency program provided at iHope during the 2017-18 school year as set forth in the unappealed April 2018 IHO decision." (Id. at 6.) She relied on the fact that iBrain did not have a vision services specialist for its first two and a half months or a social worker for its first month, and had not demonstrated that it was going to make up services that M.G. had missed. (Id. ) Plaintiffs did not appeal this decision to the SRO. (Decl. of Brain Davenport in Opp. to Pls.' App. For an Order to Show Cause for a Prelim. Inj. and TRO ("Davenport Decl."), Dkt. No. 13, ¶¶ 6-7.)
The merits of Plaintiffs' underlying due process claim is currently being litigated. Neither party has provided any information on the positions that are being taken in these proceedings. The limited information provided to the Court is that on April 29, 2019, Plaintiffs and the DOE appeared for the first hearing on the substantive issues contained in the complaint. The next scheduled hearing date is June 13, 2019. (Davenport Decl. ¶ 8.)
E. Plaintiffs' Financial Obligations to iBrain
Plaintiffs have placed M.G. at iBrain unilaterally; therefore, they are ultimately responsible for M.G.'s tuition up and until there is any decision that the tuition must be reimbursed and/or paid by the school district, as Plaintiffs have requested in their Due Process compliant.
However, pursuant to their contract with iBrain, Plaintiffs are not currently required to make any tuition payments - their payments are suspended pending resolution of their current due process complaint. Plaintiffs' contract with iBrain says, "It is understood [that a parent] may seek public funding from the local school district to pay for Student's Full Tuition ... by asserting [the] Student's due process rights." (Ashanti Decl. Ex. E ("iBrain Contract") Addendum § 8.) As a result, when a parent is required to file a complaint against the local school district for an Order of Pendency and/or Findings of Fact and Decision for funding, "the tuition payment obligations ... will be suspended, except those obligations outlined in section 8(a) [and] 8(b), until a final determination/decision is issued ... and then all monies then-due will become immediately due within thirty (30) days." (Id. ) Section 8(a) says that if a parent seeks and is granted an Order on Pendency, payment is due within 30 days and remain in effect until the Order on Pendency is no longer active. (Id. ) Section 8(b) says that if the Order on Pendency is denied, the Parent may immediately withdraw the student from iBrain, "but will be required to execute a payment schedule to comply with the contractual obligations based on the financial need of [the] parent for any balances due to iBrain on the date of withdrawal." (Id. § 8(b).)
There is nothing in the contract that says if an order on pendency is denied, but the parent is still seeking funding pursuant to a due process complaint, the parent will be required to make payments until there is a resolution of the due process complaint. Indeed, the contract explains that while a parent is waiting for a final determination on the Findings of Fact and Decision for funding, no tuition is due. (Id. § 8.) However, if a parent seeks a findings of fact and decision but is denied all or part of the full tuition funding, the parent remains responsible for any incurred tuition and fees. (Id. §§ 9, 11.)
F. Procedural History
On April 2, 2019, Plaintiffs filed the instant Complaint against the DOE, asking *453 for a temporary restraining order and preliminary injunction vacating IHO Carter's IOP dated March 5, 2019, and ordering the DOE to fund M.G.'s pendency placement at iBrain until a final adjudication on the due process complaint. (Dkt. No. 1.) Plaintiffs argue that the IHO erred in finding that the iBrain educational programming was not substantially similar to the programing M.G. received at iHope or, alternatively, that the IHO erred in failing to grant M.G. pendency placement iBrain based on an alternative theory of operative placement in recognition of M.G.'s entitlement to pendency. (Ashanti Decl. ¶¶ 17-18.) The Complaint is related solely to the IHO's pendency decision; it is not related to the merits of the administrative Due Process complaint.
Fifteen days later, on April 17, 2019, Plaintiffs filed their Order to Show Cause with the Court. (Dkt. No. 8.) The Court denied the TRO, and set a briefing schedule for the preliminary injunction motion, which is addressed below. (Id. )
III. Discussion
A. Subject Matter Jurisdiction
Defendant makes four arguments as to why this Court lacks subject matter jurisdiction: (1) there is no injury in fact; (2) there is no causation; (3) Plaintiffs' claim is not ripe; and (4) they have not exhausted their remedies as required by the IDEA.
1. Standing
Standing to sue under Article III is a "threshold question in every federal case." Nat. Res. Def. Council v. Nat'l Highway Traffic Safety Admin. , 894 F.3d 95, 103 (2d Cir. 2018) (internal quotation omitted). "To establish Article III standing, a plaintiff must demonstrate: (1) injury-in-fact, which means 'an actual or imminent' and 'concrete and particularized' harm to a 'legally protected interest'; (2) causation of the injury, which means that the injury is 'fairly traceable' to the challenged action of the defendant; and (3) redressability, which means that it is 'likely,' not speculative, that a favorable decision by a court will redress the injury." Id. (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) ).
a) Injury in Fact
To establish injury in fact, a plaintiff must show that she suffered "an invasion of a legally protected interest" that is "concrete" (which means "it must actually exist"), "particularized," and "actual or imminent, not conjectural or hypothetical." Spokeo, Inc. v. Robins, --- U.S. ----, 136 S. Ct. 1540, 1548, 194 L.Ed.2d 635 (2016) (quoting Lujan, 504 U.S. at 560, 112 S.Ct. 2130 ).
The violation of statutory rights can give rise to injury in fact. See Heldman v. Sobol , 962 F.2d 148, 154 (2d Cir. 1992) ("Congress may create a statutory right the alleged violation of which constitutes injury in fact."). Second Circuit courts have specifically recognized that violation of "a procedural right created by the IDEA ... constitutes an injury sufficient to satisfy the standing requirement." S.W. v. New York City Dep't of Educ. , 646 F. Supp. 2d 346, 358 (S.D.N.Y. 2009). In the Second Circuit, the denial of a FAPE and an impartial due process hearing about IDEA-related concerns confer injury in fact for standing purposes. See id. ; Heldman, 962 F.2d at 154-56.
Defendant argues that Plaintiffs have not suffered an injury in fact because, until the underlying due process challenge is heard and there is a final administrative ruling, they are in no danger of having to pay M.G.'s tuition or fees. (See Def.'s Mem. of Law in Opp. to Pls.' Application for a T.R.O. and Prelim. Inj. ("Def.'s Br."), Dkt.
*454 No. 12, at 5.) Plaintiffs, on the other hand, argue that the DOE is violating M.G.'s statutory entitlement to a pendency placement, which constitutes injury in fact.
At issue in this case is Defendant's alleged violation of the "stay put" provision of IDEA. The "stay put" provision of IDEA creates a procedural right. See A.S. ex rel. P.B.S. v. Bd. of Educ. for Town of W. Hartford, 47 F. App'x 615, 616 n.2 (2d Cir. 2002) ; Cruz v. New York City Dep't of Educ. , No. 18 CIV. 12140 (PGG), 2019 WL 147500, at *5 (S.D.N.Y. Jan. 9, 2019). It follows that violation of the "stay put" provision of IDEA creates an injury in fact that confers standing.
In recent cases, with facts nearly identical to those in this case, two of my colleagues concluded that the plaintiff parents had standing to pursue a claim for denial of adequate pendency placement.
In Cruz v. New York City Dep't of Educ. , No. 18 CIV. 12140 (PGG), 2019 WL 147500 (S.D.N.Y. Jan. 9, 2019), the plaintiff, like the Carrilos, unilaterally transferred her son from iHope to iBrain, and then filed a due process complaint against the DOE seeking payment for the full cost of tuition iBrain. Id. at *1. In the underlying pendency hearing, the IHO found that iHope was the appropriate pendency placement, and refused to consider whether iHope and iBrain were "substantially similar" - even though the SRO had remanded the case after an initial appeal for the express purpose of having the IHO make such a finding. Id. at *3. The IHO said that his decision was "a final pendency order." Id. at *4. The plaintiff did not appeal the IHO's second decision to the SRO, but instead, filed an application with the Southern District of New York for a TRO requiring the school district to pay the student's tuition at iBrain, because it was his pendency.
The DOE argued that the plaintiff lacked standing because she had suffered no injury in fact. Judge Gardephe found that the plaintiff had suffered an injury in fact because her "stay put" procedural right had been violated by the IHO's adverse pendency decision. As he explained, "Plaintiff [who received an adverse decision from the IHO] was ... denied what she contends is the pendency placement that the law requires. Accordingly, Plaintiff has demonstrated an injury in fact in the form of a violation of Plaintiff's procedural right pursuant to 20 U.S.C. § 1415(j)." id. at *6.
Three months later, Judge Daniels made a similar finding as to standing with respect to injury in fact, in a case with facts that are also nearly identical to the case at bar. In de Paulino v. New York City Dep't of Educ. , No. 19 CIV. 222 (GBD), 2019 WL 1448088 (S.D.N.Y. Mar. 20, 2019), the plaintiff, like Plaintiffs here, unilaterally transferred her son from iHope to iBrain and then filed a due process complaint, alleging that the DOE failed to provide a FAPE and seeking a pendency order funding the student's placement at iBrain. Id. at *2. As here, the IHO denied the pendency request. Id. The plaintiff failed to perfect her appeal to the SRO and instead, filed a case with the district court. Id. Judge Daniels, like Judge Gardephe in Cruz, found that that plaintiff had suffered injury in fact "in the form of the alleged violation of her son's procedural right to a pendency placement." Id. at *3.
In Cohen v. New York City Dep't of Educ. , No. 18-CV-11100 (JMF), 2018 WL 6528241 (S.D.N.Y. Dec. 12, 2018), by contrast, my colleague, Judge Furman, concluded that the plaintiffs had not demonstrated injury in fact in an iHope to iBrain transfer case - but in that case, the IHO had concluded that iBrain was the appropriate pendency placement for the student *455 during the ongoing due process proceedings. Id. at *1. The DOE appealed the IHO's decision to the SRO and refused to fund iBrain tuition pending appeal to the SRO, so the plaintiffs applied for a TRO requiring the DOE to find the placement pending the SRO's decision, which was expected "within weeks." Id at *1. Judge Furman found that there was no injury in fact because the plaintiffs - who had prevailed on the issue of pendency in the administrative hearing - had not demonstrated that there was any risk that their child would be expelled from iBrain during the pendency of the DOE's appeal to the SRO. Id. He noted specifically that risk of expulsion due to outstanding tuition bills was the primary harm identified by the plaintiffs, and that the parents had not yet suffered any financial injury, since the enrollment contract with iBrain did not require parents to pay any tuition until final adjudication of the underlying due process proceeding. Id. at *2.[1]
Obviously, the underlying posture of Cohen is different from that in Cruz and de Paulino . In Cohen, the plaintiffs were attempting to enforce a favorable IHO decision; in both Cruz and de Paulino , the plaintiffs had received an adverse IHO decision, which they were arguing was incorrect. It was because of these adverse decisions that the courts in Cruz and de Paulino found that the plaintiffs had standing to pursue a claim that their statutory rights had been violated, without regard to having standing to pursue their claim for tuition reimbursement.
This case is clearly closer to Cruz and de Paulino . As in those cases, Plaintiffs received an adverse pendency ruling. Like my colleagues in the Cruz and de Paulino cases, I find that Plaintiffs have standing because they have suffered an injury in fact by virtue of being denied a ruling that iBrain was the child's pendency.
b) Causation
The traceability requirement for Article III standing requires that the plaintiff " 'demonstrate a causal nexus between the defendant's conduct and the injury.' " Rothstein v. UBS AG, 708 F.3d 82, 91 (2d Cir. 2013) (quoting Heldman, 962 F.2d at 156 ). A causal nexus is "most easily shown" by a direct relationship between the plaintiff and defendant, but indirectness is not fatal; indeed, the standard is less than the concept of proximate causation. Id. at 91. "The fact that there is an intervening cause of the plaintiff's injury may foreclose a finding of proximate cause but is not necessarily a basis for finding that the injury is not 'fairly traceable' to the acts of the defendant." Id. at 92.
Defendant argues that Plaintiffs have not alleged facts establishing that the injury "fairly can be traced" to the DOE. Simon v. E. Kentucky Welfare Rights Org. , 426 U.S. 26, 41-42, 96 S.Ct. 1917, 48 L.Ed.2d 450 (1976). Defendant suggests that because Plaintiffs were responsible for moving M.G. from iHope to iBrain, no DOE action has caused the injury. But the injury here is the failure to find that iBrain is the proper pendency placement for M.G., and that decision was the result of DOE's argument in front of the hearing officer. Thus, the hearing officer's decision that the pendency placement was iHope *456 was clearly traceable to the DOE. See Cruz, 2019 WL 147500, at *7 (finding injury traceable to DOE on nearly identical facts).
2. Ripeness and Exhaustion of Remedies
Defendant argues both that the IHO decision is not ripe for this Court's review because Plaintiffs failed to appeal the March 5 IOP order to the SRO (Def.'s Br. at 7-8), and that Plaintiffs' failure to exhaust administrative remedies precludes the Court's review (id. at 10 11). These arguments can be addressed at once because they are essentially the same point made twice.
"The doctrine of ripeness embodied in Article III of the United States Constitution ensures that a dispute has 'matured to a point that warrants decision.' " Mehta v. Surles, 720 F. Supp. 324, 334 (S.D.N.Y. 1989) (internal quotation removed), aff'd in part, vacated in part, 905 F.2d 595 (2d Cir. 1990). "[I]ts basic rationale is to prevent the courts, through premature adjudication, from entangling themselves in abstract disagreements." Thomas v. Union Carbide Agr. Prod. Co. , 473 U.S. 568, 580, 105 S.Ct. 3325, 87 L.Ed.2d 409 (1985) (citing Abbott Laboratories v. Gardner, 387 U.S. 136, 148, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ).
The IDEA contains an exhaustion requirement such that failure to exhaust "deprives a court of subject matter jurisdiction." Polera v. Bd. of Educ. of Newburgh Enlarged City Sch. Dist. , 288 F.3d 478, 483 (2d Cir. 2002). But the exhaustion requirement is "not an inflexible rule." Murphy, 297 F.3d 195, 199 (2d Cir. 2002) (citing Mrs. W. v. Tirozzi, 832 F.2d 748, 755 (2d Cir. 1987) ). Exhaustion is not required when "(1) it would be futile to resort to the IDEA's due process procedures; (2) an agency has adopted a policy or pursued a practice of general applicability that is contrary to the law; or (3) it is improbable that adequate relief can be obtained by pursuing administrative remedies." Id.
In Murphy v. Arlington Cent. Sch. Dist. Bd. of Educ. , 297 F.3d 195 (2d Cir. 2002), while seeking an administrative ruling on the appropriate placement for their child, the parents went directly to the district court on the issue of pendency. Id. at 198. The Second Circuit found that the district court had jurisdiction, despite the parents' failure to exhaust administrative remedies. Id. at 199-200. Then-Judge Sotomayor held that a plaintiff need not exhaust a "stay put" related claim because, "as a practical matter, access to immediate interim relief is essential for the vindication of this particular IDEA right." Id. at 200 ; see also Doe, 790 F.3d at 455 ; Avaras v. Clarkstown Cent. Sch. Dist. , No. 15 CV 9679 (NSR), 2018 WL 4103494, at *3 (S.D.N.Y. Aug. 28, 2018) ; Bd. of Educ. of Uniondale Union Free Sch. Dist. v. J.P. , No. CV181038JMAAYS, 2018 WL 3946507, at *4-*5 (E.D.N.Y. June 21, 2018), report and recommendation adopted, No. 18CV1038JMAAYS, 2018 WL 3941945 (E.D.N.Y. Aug. 15, 2018). The "administrative process is 'inadequate' to remedy violations of [the 'stay put' provision], given [its] 'time sensitive nature.' " Murphy, 297 F.3d at 199. "Since the purpose of the stay-put provision is to keep the child in an existing placement until all proceedings-administrative and judicial-have run their course, there is no evident reason why administrative proceedings should have to be recommenced to that end." Doe, 790 F.3d at 455.
Defendant argues that the exhaustion exception, as articulated in Murphy, applies only when a school district has "egregiously" failed to comply with the terms of a pendency order in a timely manner - *457 such that the district's failure to comply poses a threat to the stability of the student's education. (Def.'s Br. at 11.) It contends that since there is no underlying finding that iBrain is the proper pendency placement (such that the District is failing to comply) and there is no evidence that M.G. will be removed from iBrain, the exhaustion requirements must apply. (Id. )
But that is not how courts in this Circuit have interpreted and applied Murphy. Indeed, as one court in this Circuit has observed, "many of the cases that apply th[e pendency exhaustion] exception, including Murphy , involve situations where the parents sought reimbursement for educational expenses they already paid for themselves. In those cases ... there was no evidence that the student would be immediately ejected from the school if the parents did not prevail in their 'stay-put' claim." de Paulino, 2019 WL 1448088, at *6 (emphasis in original) (internal citations removed) (citing cases).
Nor do other differences between this case and Murphy prohibit this court's review. Unlike in Murphy, Plaintiffs first pursued an administrative ruling on the pendency issue - one that was not resolved in their favor - and then filed their Complaint, without first pursuing an interim administrative appeal to the SRO. This partial engagement with the administrative proceeding does not create an obligation to fully exhaust all administrative proceedings, and is not fatal to Plaintiffs' claim. "Under the IDEA, plaintiffs bringing pendency claims do not need to exhaust all administrative remedies, even if the underlying administrative decision on pendency is not in their favor." Id. at *5. Indeed, courts in this circuit have found that the exhaustion exemption applies in the stay put context, when, as here, (1) Plaintiffs have engaged in all or part of the administrative process on the pendency issue, (2) have received rulings not in their favor, and (3) have pursued relief with the district court while their due process complaint continues to be litigated as part of the administrative process. See, e.g., id. (plaintiff who received adverse decision from IHO and failed to perfect appeal qualified for exhaustion exemption); Cruz, 2019 WL 147500, at *8 ; M.G. v. New York City Dep't of Educ. , 982 F. Supp. 2d 240, 248 (S.D.N.Y. 2013) ; cf, M.M. ex rel. J.M. v. New York City Dep't of Educ. , No. 09 CIV. 5236 (PAC), 2010 WL 2985477, at *10 (S.D.N.Y. July 27, 2010) (finding failure to exhaust pendency claim was fatal since plaintiffs did not seek injunctive relief for pendency until their administrative challenge to the underlying IEP was over).
Accordingly, Plaintiffs were not required to have fully exhausted their administrative remedies for this court to retain subject matter jurisdiction.
B. Plaintiffs' Claim for Injunctive Relief
Plaintiffs seek a preliminary injunction vacating IHO Carter's March 5 IOP, and ordering the DOE to fund M.G.'s pendency placement at iBrain for the 2018-19 school year, or until a final adjudication on their due process complaint is complete.
1. Preliminary Injunction Standard
"A preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the defendant by a clear showing, carries the burden of persuasion." Sussman v. Crawford, 488 F.3d 136, 139 (2d Cir. 2007) (emphasis in original) (internal quotation removed). Pursuant to Fed. R. Civ. P. 65, a court may issue a preliminary injunction when the moving party demonstrates that (1) she is likely to succeed on the merits, (2) she is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in her favor, and *458 (4) an injunction is in the public interest. See Winter v. NRDC, Inc. , 555 U.S. 7, 20, 129 S.Ct. 365, 172 L.Ed.2d 249 (2008).
However, when a plaintiff is invoking the right to pendency pursuant to § 14150), the traditional preliminary injunction test does not apply. See Cronin v. Bd. of Educ. of E. Ramapo Cent. Sch. Dist. , 689 F. Supp. 197, 202 (S.D.N.Y. 1988). Instead, the "stay put" provision provides an "automatic preliminary injunction." Id. (citing Honig, 484 U.S. at 326-27, 108 S.Ct. 592 ); see also Arlington Cent. Sch. Dist. , 421 F. Supp. 2d at 696 ("Pendency has the effect of an automatic injunction ..."). "The statute substitutes an absolute rule in favor of the status quo for the court's discretionary consideration of the factors of irreparable harm and either a likelihood of success on the merits or a fair ground for litigation and a balance of hardships." Zvi D. , 694 F.2d at 906 ; see also Arlington Cent. , 421 F. Supp. 2d at 696.
Since the Court's "enforcement of IDEA's pendency provision is automatic and does not require a showing of irreparable harm, likelihood of success on the merits, [or] a balancing of the hardships, all that remains [for this Court] is to determine [the Child's] 'current educational placement.' " M.G. , 982 F. Supp. 2d at 247 (internal quotations removed).
Defendant points to the fact that in Cohen, Judge Furman observed that the "automatic preliminary injunctive" directive has "less purpose ... in a case where there is no meaningful threat that a student will be removed from his pendency placement." Cohen, 2018 WL 6528241, at *2. But, as the Court has addressed, see infra III.A.2.a., in Cohen, the plaintiffs had received a pendency decision in their favor and the child was, by the administrator's finding, in his pendency placement. Id. at *2. ("In this case, the underlying due process complaint has not been resolved, so under the plain language of the enrollment contract, Plaintiffs have no obligation even to make tuition payments for [the child].") That is why there was no "meaningful threat" that the student would be removed from the placement even in the absence of interim payment. That is different from this case, where IHO Carter found that the requested pendency placement was not the appropriate pendency placement, and so there is the possibility that Plaintiffs' tuition at iBrain could ultimately be denied, including for the time when Plaintiffs were waiting for the due process decision. Moreover, the statement in Cohen is dicta - Cohen was dismissed for lack of standing; thus, the rumination on the injunctive relief standard is in no way binding on this Court. Id. ; see also Cruz, 2019 WL 147500, at *9 (discussing why Cohen does not "overturn well settled law that irreparable harm need not be shown to obtain injunctive relief regarding pendency").
2. Standard of Review
The IHO's decision is subject to independent judicial review. Yet, the role of a district court in reviewing a state administrative decision under the IDEA is "circumscribed" and courts are not to "substitute their own notions of sound educational policies for those of the school authorities." M.H. v. New York City Dep't of Educ. , 685 F.3d 217, 240 (2d Cir. 2012) (internal quotation removed). Instead, the court "must engage in an independent review of the administrative record and make a determination based on a 'preponderance of the evidence.' " Id. (quoting Gagliardo v. Arlington Cent. Sch. Dist. , 489 F.3d 105, 112 (2d Cir. 2007) ). The standard of review "requires a more critical appraisal of the agency determination than clear-error review but nevertheless falls well short of complete de novo review."
*459 GB v. New York City Dep't of Educ. , 145 F. Supp. 3d 230, 245 (S.D.N.Y. 2015) (quoting M.H. , 685 F.3d at 244 ).
Deference to the underlying decision is warranted when the decision is "reasoned and supported by the record." M.H. , 685 F.3d at 241 (quoting Gagliardo, 489 F.3d at 114 ). "In deciding what weight is due to an IDEA administrative decision, the analysis often 'will hinge on the kinds of considerations that normally determine whether any particular judgment is persuasive' ... include[ing] the quality and thoroughness of the reasoning, the type of determination under review, and whether the decision is based on the administrative body's familiarity with the evidence and the witnesses." Reyes ex rel. R.P. v. New York City Dep't of Educ. , 760 F.3d 211, 218 (2d Cir. 2014) (quoting M.H. , 685 F.3d at 244 ). However, an administrative "determination of a pure question of law is not subject to deference." Carmel Cent. Sch. Dist. v. V.P. ex rel. G.P. , 373 F. Supp. 2d 402, 408 (S.D.N.Y. 2005), aff'd sub nom. Carmel Cent. Sch. Dist. v. V.P. , 192 F. App'x 62 (2d Cir. 2006).
3. Analysis
a) iBrain is M.G.'s pendency placement
Plaintiffs first argue that IHO Carter erred when she found that M.G.'s educational program at iBrain for the 2018-19 school year was not "substantially similar" to her educational program at iHope for the 2017-18 school year.
There is no question that at iBrain, the intention was that M.G. receive academic and related services that were identical to those provided at iHope - services found by IHO Carter to meet the student's needs in her April 27, 2018 FOFD. (See iBrain proposed IEP.) The only differences between M.G.'s iHope proposed IEP and her iBrain proposed IEP are that her iBrain proposed IEP requires one more individual speech-language therapy session per week (the number of group sessions remains the same), and one fewer assistive technology session per week. This minute difference mattered not a whit to the IHO - nor would it to this Court under a "substantially similar" standard (which is by definition not identical).
IHO Carter ruled as she did because she found that iBrain could not and did not provide all of the related services that it had determined were necessary for M.G. to receive, and that she had been receiving at iHope.
Specifically, IHO Carter found that because iBrain, a new school that was still staffing up, did not have a vision specialist on staff until September 2018 and did not have a social worker on staff until August 2018, it was not "substantially similar" to iHope, which did have their specialists on staff for the beginning of the school year. (March 5 IOP at 4, 6.) She wrote that the failure to provide vision services from July 2018 to September 2018 was a change affecting M.G.'s educational program because there was no information in the record indicating that the placement would have been appropriate for the student without a vision service provider from day one. (Id. ) Moreover, IHO Carter found that there was "no concrete plan for these missed services to be made up," even though Dr. Mensah and Ms. Semm both testified that make-up sessions were in progress; she refused to rely on this testimony without documentary evidence. (Id. at 4.)
IHO Carter made a similar finding with respect to parent counseling and training. She found that because iBrain did not have a social worker on staff to implement counseling - which was all the more critical because iBrain was in a temporary location and the student was adjusting to new routines *460 and staff - iBrain was not "substantially similar" to iHope. (Id. at 5.) More generally, IHO Carter found that the testimony of both Ms. Semm and Dr. Mensah was "conclusory rather than factual" and that the record lacked documentary evidence and testimony from the vision services educator. (Id. at 6.)
I cannot agree with IHO Carter's findings.
First of all, I find both witnesses' testimony credible. IHO Carter took issue mostly with Dr. Mensah's testimony, finding that she was "biased" toward iBrain. But the fact that Dr. Mensah was consulting at iBrain in July of 2018 while on maternity leave from iHope does not mean that she was necessarily "[ ]biased in her testimony," as IHO Carter suggests. (Id. at 3.) In fact, Dr. Mensah's testimony indicated no "biases" - she confirmed that the services provided at iHope and iBrain were essentially the same and she in no way implied that one school was superior to the other. Moreover, the transcript does not evidence that Dr. Mensah "embellished" her testimony at "critical points." (Id. ) Dr. Mensah said that she was at iBrain "occasionally but ... wasn't there every day" during the period she was consulting, prior to her official hire as clinical director, which she further specified meant she made weekly visits. (Jan. 14. Tr. 114:7-13.) This statement is not, as IHO Carter suggests, "irreconcilable" with her statement that she made "countless" visits to iBrain prior to her full-time employment. (March 5 IOP at 4; Jan. 14 Tr. 140:18-22.) At most, it is a minor discrepancy that certainly does not "undercut her knowledge of how iBrain was operating before October 2018." (March 5 IOP at 3.) Finally, Dr. Mensah's deference to Ms. Semm with respect to the specifics of M.G.'s program was not inappropriate given Dr. Mensah's role as clinical director and Ms. Semm's role as the special education director.
As for Ms. Semm, IHO Carter found that her testimony was "conclusory rather than factual." (Id. at 6.) However, Ms. Semm testified with specificity about the services that M.G. received, the existence of a plan to make up missed services, how these services are being made up, and how vision services were incorporated into the classroom when there was no vision specialist. (Jan. 14 Tr. 148:5-151:12, 155:18-160:3, 164:8-169:2.) These statements did not become conclusory simply because Ms. Semm did not provide the exact dates and times at which the sessions were made up. (Id. at 5.)
Second of all, I find that based on the testimony of Dr. Mensah and Ms. Semm, the preponderance of the evidence suggests that the programs at iBrain and iHope are "substantially similar" such that iBrain is an appropriate pendency placement for M.G.
In her findings, IHO Carter relied on Lunceford v. D.C. Bd. of Education, 745 F.2d 1577 (D.C. Cir. 1984), which holds that the "elimination of a basic element of the education program" constitutes a change in educational placement. Id. at 1582 (relying on the Second Circuit's decision in Concerned Parents ). But here, there was no elimination of any services previously enjoyed by M.G.; rather, the vision services and family counseling services were delayed - the vision services by three months and the family counseling services by one month.[2] (Jan. 14. Tr. 110:1-11; 130:10.) There is no dispute that the relevant services were available by August for parent counseling and mid-September for vision services.
*461 Based on my calculations, this means that M.G. missed one parent counseling session and about twenty vision services session. This former is insignificant. The latter is not. But the relevant question is twofold: (1) whether the makeup sessions actually occurred or are presently occurring and (2) whether makeup sessions later in the year are sufficient to ensure there was no elimination of a basic element of the education program.
M.G.'s parents missed one - and only one - parent counseling session in July 2018, when iBrain did not have a social worker on staff. The social worker was hired on August 1, 2018, so the parent counseling service was provided from the second month of operation and Dr. Mensah testified that the one missed parent counseling session was made up at that time. (Id. 130:3-10.)
The loss of this one session is de minimus loss of services. Eleven counseling sessions, rather than twelve, clearly meets the standard of "substantially similar." Moreover, this service, while beneficial to M.G., is importantly only of secondary benefit, since it is provided to and for the parents, not the child. IHO Carter's concern that the social worker was not present at the beginning of the school year is understandable, but the fact that many of the staff at iBrain were already familiar to the student and family because they came from iHope, combined with the fact that the social worker started three weeks after M.G. arrived at the school, leads me to conclude that the absence of a social worker to work with the parents (not M.G.) for three weeks was not an elimination of services and does not mean that the schools were not "substantially similar."
The loss of twenty sessions of vision services over a two and a half month period is more troubling. And, if there were no plan to make up those services, then they would be effectively eliminated, which would render the educational program at iBrain not "substantially similar" to that at iHope. All of the evidence, however, is to the effect that M.G. is receiving make-up sessions.
Both Dr. Mensah and Ms. Semm testified that M.G. will have made up all twenty missed vision sessions by the end of the school year. Dr. Mensah testified: "[T]here is a plan. The sessions have been calculated and already being - are in the process of being made up." (Id. 136:18-137:1) At least one session had already been made up at the time of the testimony, and Dr. Mensah estimated that the rest of the sessions would be completed within the next two months. (Id. 137:3-11,) Ms. Semm, who is the expert in M.G.'s programming, testified that iBrain is currently making up vision services that were missed between July 9 and the middle of September, and anticipates that they will all be made up by the end of the current school year. (Id. 156:3-6.)
Both Dr. Mensah and Ms. Semm also testified that M.G.'s vision goals were incorporated into the classroom setting during the time when a vision specialist was not available. (Id 141:14-16; 156:18-159:13.) Ms. Semm testified that during the time when there was no vision specialist at iBrain, the classroom teacher supported M.G.'s vision needs by "strategically implementing the IEP[ ] and presenting materials in a specific way throughout the school day." (Id. 158:22-24.)
The DOE argued that it would be difficult to implement make-up sessions in M.G.'s schedule without jeopardizing her other required services. (March 5 IOP at 4.) While M.G. is undoubtedly "scheduled" throughout the entire school day (given her high needs), it cannot be essential that she participate in every scheduled activity. Certainly, the fact that the daily schedule *462 does not show any available 60-minute sessions where make-up sessions could take place is not dispositive, especially since Ms. Semm explained that these sessions are being scheduled during M.G.'s "free" time, when she is not in another therapy or individual academics, but rather, is scheduled for non-essential group activities such as morning meeting, afternoon recap, or read-alouds (Jan. 14 Tr. 165:17-20; 166:17-167:4). Nothing in the record suggests that this testimony is not credible.
IHO Carter relied heavily on Plaintiffs' failure to provide through documentary evidence the exact dates when make-up sessions had taken or would take place. She found, for this reason, that there was "no concrete plan for these services to be made up." (March 5 IOP at 4.) But the sworn testimony was unrebutted - significantly, the DOE did not introduce a scintilla of evidence that the child was not getting the services. In these circumstances, the IHO's requirement that the sworn, unrebutted testimony of the iBrain personnel be backed up with exact dates or some other form of confirmatory evidence was unreasonable, since the only evidence in the record was to the effect that M.G. was receiving make up sessions (and IHO Carter never indicated that she thought the testimony of the two witnesses was "incredible").
Accordingly, I cannot find, by a preponderance of the evidence, that the failure to have a vision specialist on staff during the first two and a half months of the school year is an "elimination" of vision support services, such that iBrain was not "substantially similar" to iHope. This renders IHO Carter's opinion unreasonable.
This situation is clearly different from cases in which courts have found that two programs are not "substantially similar." For example, in S.Y. v. New York City Dep't of Educ. , 210 F. Supp. 3d 556 (S.D.N.Y. 2016), the court found that the complete elimination of a one-to-one paraprofessional was a change in the student's educational placement. See id. at 572. In M-G v. Las Vegas City Sch. , No. CIV 13-0350 KBM/KK, 2015 WL 12915582 (D.N.M. Sept. 8, 2015), the court found a change in educational placement when the student was "no longer receiving specialized instruction in how to read and write in Braille or use his assistive technology," but was being read to and speaking in response. Id. at *4 ; see also M.F. v. Irvington Union Free Sch. Dist. , 719 F. Supp. 2d 302, 309 (S.D.N.Y. 2010) (recognizing possibility that eliminating developmental reading class could constitute change in educational placement). These cases involved the permanent elimination of services - "substantial" changes that led to an "outright denial of educational services." They were not cases where there was a delay, of a few days or weeks in the provision of a needed service, as is the case here. See AW ex rel. Wilson , 372 F.3d at 681 ("[A]ny definition of 'educational placement' must reflect the fact that the 'stay-put' provision is not implicated by temporary changes that track previous assignments as closely as possible and do not affect a student's FAPE ... 'stay-put' jurisprudence indicates that the provision is certainly violated by a change in location that leads to an outright denial of educational services.").
For these reasons, I find that iBrain was "substantially similar" to iHope, such that M.G.'s enrollment in iBrain did not constitute a "change in educational placement."
b) M.G. is to Receive Transportation Services
Plaintiffs also contend that IHO Carter erred by denying M.G. transportation services.
*463 In the pendency decision, IHO Carter said that "Decision #170968 [the April 2018 decision] did not order transportation." (March 5 IOP at 5.) That statement is incorrect.
First, the April 27, 2018 FOFD decision says that the DOE "shall fully [fund] tuition and related services for the 2017/18 school year at iHope." (Apr. 27 FOFD at 4.) Related services are defined in the IDEA to include transportation. See 20 U.S.C.A. § 1401 ("The term 'related services' means transportation, and such developmental, corrective, and other supportive ... as may be required to assist a child with a disability to benefit from special education."); Andree ex rel. Andree v. Cty. of Nassau, 311 F. Supp. 2d 325, 330 (E.D.N.Y. 2004) (interpreting related services to include transportation to and from school).
Second, the decision says that that the "CSE shall ... draft an IEP that incorporates all items of the iHope proposed IEP dated February 23, 2017." (Apr. 27 FOFD at 4.) The proposed iHope IEP included transportation recommendations including "busing with: adult supervision - paraprofessional; limited time travel - no more than 60 minutes," among other transportation requirements. (iHope IEP at 38.)
Plaintiffs suggest that IHO Carter's March 5 IOP denied their daughter her required transportation services. But that argument is not supported by the record. IHO Carter's discussion of transportation in her March 5 IOP was focused on whether the location change from iBrain to iHope might have substantially changed M.G.'s transportation time, not whether M.G. still required transportation services. IHO Carter was concerned that the requirement that M.G. have limited travel time was no longer being met, and that, as a result, iBrain was not a "substantially similar" to iHope.
As support for the assertion that transportation conditions might impact a student's educational placement, IHO Carter cited a Third Circuit case, DeLeon v. Susquehanna Cmty. Sch. Dist. , 747 F.2d 149 (3d Cir. 1984). In DeLeon, the court noted that "[u]nder some circumstances, transportation may have a significant effect on a child's learning experience" but that "minor changes ... will not generally have such an impact." Id. at 154. The DeLeon court went on to find that when one-on-one transportation by a parent was replaced by transportation by a third-party with a group of children, and there was a slight increase in the length of time in transit, there was no change in "educational placement." Id.
IHO Carter pointed out that Plaintiffs failed to present any testimony about M.G.'s travel time to iBrain as compared to iHope, and that the only evidence about M.G.'s transportation was the father's oral confirmation that M.G. was receiving transportation to iBrain; no other details about this transportation were provided. IHO Carter was concerned that the travel did not meet the requirement of the iHope proposed IEP or the iBrain proposed IEP, which both mandate no more than sixty minutes of transportation time each way.
It is true that Plaintiffs did not submit testimony or evidence about travel time to the IHO. However, Plaintiffs contend that M.G.'s travel time to iBrain is no more than sixty minutes each way per day while at iBrain. (Ashanti Decl. ¶ 11.) While Plaintiffs should have included in the record information about the distance from M.G.'s residence to iBrain for the Court, there is, alternatively, no evidence that iBrain is more than 60 minutes travel time from M.G.'s residence, nor is there any reason, based on the record, to believe that M.G. is not meeting the travel-related guidelines imposed by both the iHope and *464 iBrain proposed IEPs. Indeed, the Ashanti declaration confirms that M.G. is receiving the required special transportation services and meeting the time-limit on her travel time while at iBrain. (Id. )
Thus, I don't find that the possibility (which is contrary to statement in the Ashanti affidavit) that M.G. is not receiving the same transportation services to preclude by a preponderance of the evidence a finding that iBrain constitutes the same educational placement as iHope. M.G. should receive transportation services for iBrain, as she would have received had she been at iHope,[3]
c) Plaintiffs' Alternative Arguments
As an alternative argument, Plaintiffs contend that M.G. is entitled to pendency placement at iBrain because it is her "operative placement." (Mem. of Law in Supp. of Order to Show Cause for TRO and Prelim. Inj. ("Pls.' Br."), Dkt. No. 15, at 15.) The "operative placement" factor requires the Court to look at the "operative placement actually functioning at the time when the stay put provision of the IDEA was invoked." Doe, 790 F.3d at 452.
Courts tend to rely on the "operative placement" factor in circumstances in which there was no prior- implemented IEP that might guide a determination of a "current educational placement." See Avaras, 2018 WL 4103494, at *6 (relying on "operative placement" to determine pendency when the "first and third factors of the [ Murphy ] test [were] equally inapplicable"); see also Pardini v. Allegheny Intermediate Unit, 420 F.3d 181, 190 (3d Cir. 2005) ("[W]here ... the dispute arises before any IEP has been implemented, the current educational placement will be the operative placement under which the child is actually receiving instruction at the time the dispute arises." (internal quotation omitted)). Plaintiffs have pointed to no case in which a Court has relied on the "operative placement" provision when there was a prior-approved and implemented IEP. Indeed, they seem to concede this fact, explaining that "Courts have ordered pendency at the operative placement when it is deemed necessary. " (Pls.' Br. at 15 (emphasis added)).
But here, reliance on the operative placement provision is not necessary. M.G. had an un-appealed decision that found that placement at iHope provided her with an appropriate education, that the DOE had to fund her tuition and related services at iHope for the 2017-18 school year, and that the iHope proposed IEP outlined the necessary requirements for her education. It follows that the appropriate analysis is to focus on the first and third factors outlined in Murphy, and the substantial similarity between iHope and iBrain, rather than the "operative placement" factor.
Finally, Plaintiffs argue that the DOE has failed to provide M.G. with a pendency placement, which is an "impossible result." Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist. , 368 F. Supp. 2d 313, 325 (S.D.N.Y. 2005). They contend that if "DOE truly had an issue with [M.G.'s placement at iBrain], it should have promptly secured M.G. a seat at any school, iHope for example, that it believed could implement M.G.'s then-current educational placement." (Pls.' Br. at 16.) But Plaintiffs have not established that the DOE has an obligation to do that. In *465 Gabel ex rel. L.G. v. Bd. of Educ. of Hyde Park Cent. Sch. Dist, upon which Plaintiffs' rely, the court found that when the district was not recommending continuation of the placement in the student's last-agreed upon IEP and had provided no alternative placement for the student, there was essentially "no pendency placement." Id. at 325-26. But here, the DOE does not appear to dispute that M.G.'s pendency should have been iHope. The fact that DOE did not contact iHope. to determine that a space was available does not necessarily mean that M.G. would not have any pendency placement there, had she requested one or had she attempted to switch placements at the time the IHO issued its decision. Plaintiffs further argue that even if DOE had no obligation to secure M.G. a seat for pendency purposes, without pendency at iBrain, M.G. will not have any pendency placement, but I cannot make this finding without a showing that iHope would not have been able to accept the student.
IV. Conclusion
The IHO decision dated March 5, 2019 is vacated, and Plaintiffs' motion for a preliminary injunction is granted. The DOE must fund M.G.'s pendency placement at iBrain from the 2018-19 school year, until a final adjudication on the due process complaint is complete.
Counsel for the parents should submit a motion for attorneys' fees within ten days of the date of this decision. If the parties are able to come to an agreement about attorneys' fees, please submit a consent judgment.

Both Judge Gardephe and Judge Daniels concluded that the plaintiffs had suffered injury in fact due to potential "exposure to suit for nonpayment" because they might incur financial obligations to iBrain if they were to receive adverse decisions on their due process complaints. It seems that Judge Furman might disagree with this assessment. Because I find that Plaintiffs have suffered injury in fact based on the alleged failure to provide them with their desired pendency placement, I need not address the issue of financial harm and I decline to do so.

The school was also short a hearing therapist, which is not relevant for M.G., as she does not require hearing services. (Jan. 14 Tr. 131:11-18.)

In her decision, IHO Carter wrote that the DOE alleges that iBrain is using a private vendor for transportation, an issue that is to be explored during the due process proceedings. (March 5 IOP at 5.) This is not directly relevant to this decision, and the fact that as part of her pendency placement, M.G. requires transportation services.